**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.:

WENDUO GUO, Derivatively on Behalf of CLOVIS ONCOLOGY, INC.,

Plaintiff,

v.

PATRICK J. MAHAFFY,
DANIEL W. MUEHL,
GILLIAN C. IVERS-READ,
M. JAMES BARRETT,
BRIAN G. ATWOOD,
JAMES C. BLAIR,
PAUL H. KLINGENSTEIN,
EDWARD J. MCKINLEY,
THORLEF SPICKSCHEN,
KEITH FLAHERTY,
GINGER L. GRAHAM,
ERLE T. MAST, and
ANDREW R. ALLEN,

Defendants,

- and -

CLOVIS ONCOLOGY, INC., a Delaware corporation,

Nominal Defendant.

---

# VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

---

Plaintiff Wenduo Guo, by his undersigned counsel, submits this Verified Stockholder Derivative Complaint on behalf of nominal defendant Clovis Oncology, Inc. ("Clovis" or the "Company") against the defendants named herein. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") of Clovis and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1. This is a stockholder derivative action brought by plaintiff, a stockholder of Clovis, on behalf of the Company against certain of its current and former officers and directors. This action seeks to remedy the defendants' violations of law addressed herein, including violation of securities law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment that have caused substantial damage to Clovis.

2. Clovis is a biopharmaceutical company that focuses on acquiring, developing, and commercializing innovative anti-cancer agents in the United States, Europe, and additional international markets. Until recently, the Company never had a revenue-generating product on the market, and has long been heavily dependent on capital raised from investors to fund the research and development costs for its pipeline.

3. For years, the most important and prominent of the three drugs in Clovis' pipeline was a proprietary cancer drug called rociletinib. Rociletinib was a purportedly revolutionary

cancer medication that was designed to treat lung cancer patients who were resistant to front-line therapies, an estimated $3 billion untapped global market.

4. Beginning in or about at least 2013, Clovis enrolled rociletinib in a series of clinical tests in attempt to receive approval for a new drug application ("NDA") from the U.S. Food and Drug Administration ("FDA"), including a multi-year safety and efficacy trial called "TIGER-X," and an additional efficacy trial called "TIGER-2." According to the Company, the "primary endpoint" (i.e., the central measure of success) for these trials was to determine the "objective response rate" or "ORR" of rociletinib "per Response Evaluation Criteria in Solid Tumors" or "RECIST" standards. ORR describes the percentage of patients who experience clinically meaningful tumor shrinkage when treated with the drug, and RECIST is the most widely used system for assessing response in cancer clinical trials. Importantly, RECIST unequivocally requires that ***each instance of tumor shrinkage must be "confirmed" in a subsequent scan*** occurring several weeks after the initial scan. The main goal of confirmation of objective response in clinical trials is to avoid overestimating the response rate observed. Thus, tumor shrinkage ***cannot*** be included in the calculation of ORR ***unless it is confirmed***.[1]

5. For years, the Individual Defendants (as defined herein) repeatedly and brazenly misrepresented the efficacy and safety of rociletinib. Specifically, the Individual Defendants repeatedly misrepresented that: (i) reciletinib trials strictly adhered to RECIST; (ii) reciletinib was performing extremely well in trials; (iii) reciletinib had an "impressive" and "highly

[1] Unconfirmed responses can be reported in certain publications with appropriate annotations but are never the primary endpoint in a trial, especially in a pivotal trial designed to seek marketing authorization.

compelling" efficacy profile, with a 60% confirmed response rate; (iv) reciletinib had a strong safety profile, was "well tolerated," with minimal and "easily managed" side effects; and (v) rociletinib would "compete very effectively" against a similar experimental drug called Tagrisso, which was being developed by pharmaceutical giant AstraZeneca PLC ("AstraZeneca").

6. All of the above statements were grossly inaccurate. On November 16, 2015, Clovis announced that despite repeated assurances over the years specifically claiming that reciletinib trials strictly adhered to RECIST, the purportedly impressive ORR that the Company had long been reporting for rociletinib was actually "based ***primarily on unconfirmed responses***." The Company further announced that rociletinib's true ORR, based on confirmed responses, was just 30%, or ***half*** the rate that the Individual Defendants touted for years. As was later summarized by longtime cancer drug development expert, Dr. Kapil Dhingra, rociletinib's "efficacy data have, ***consistently and repeatedly, over many years, been misrepresented***."

7. These shocking revelations devastated Clovis and caused the Company's stock price to plunge ***nearly 70%*** from the previous trading day's closing price of $99.43, to close at just $30.24 on the day of the announcement, erasing ***over $2.6 billion*** in market capitalization in a single day.

8. In the following months, the Individual Defendants attempted to keep the Company's stock price from plummeting further by assuring investors that, despite rociletinib's less than stellar efficacy, the drug had a highly favorable safety profile, which could potentially help pave the way to some commercial success. Unfortunately, this too was grossly inaccurate.

9. On April 8, 2016, the FDA publicly revealed that rociletinib significantly increased the risk of "serious" and "life threatening" adverse cardiovascular events. In fact, the

dangers were so significant that the FDA concluded that if rociletinib was ever approved for commercial use, the drug would be required to display the ***strongest safety warning*** label available. Further, safety data showed that the adverse side effects of rociletinib were so severe that they forced ***more than half of all patients*** to interrupt, modify, or altogether cease therapy.

10. Analysts quickly and accurately concluded that rociletinib was "dead." On April 8, 2016, the same day as the above disclosures, Clovis' stock price fell another 17.7%, erasing over $130.4 million more of the Company's market capitalization. Within a month, the Company confirmed that rociletinib was a commercial failure, withdrew the drug's NDA from the FDA, and "terminated enrollment in all ongoing sponsored clinical studies of rociletinib."

11. As a direct result of the Individual Defendants' unlawful course of conduct, Clovis is now the subject of at least one at least one direct action filed by a private investment fund, Antipodean Domestic Partners, LP ("Antipodean"), filed in the Supreme Court of the State of New York, County of New York (the "Direct Action"), and at least one consolidated securities class action lawsuit filed in the U.S. District Court for the District of Colorado (the "Securities Class Action"). The Direct Action alleges that Antipodean suffered millions of dollars in damages by purchasing over 1.5 million shares of artificially inflated Clovis stock on the basis of false, incomplete, and misleading test data. The Securities Class Action was filed on behalf of investors who purchased shares of Clovis stock between May 31, 2014 and April 7, 2016, as well as investors who purchased Clovis stock in connection with a secondary offering held by the Company on or about July 14, 2015 (the "Offering"). The Securities Class Action alleges that documents filed by the Company with the SEC in connection with the Offering materially misled investors with respect to the commercial prospects, safety profile, and efficacy of rociletinib. On

February 9, 2017, the Court in the Securities Class Action largely denied defendants' motion to dismiss and noted that "the objective response rates for rociletnib [sic] that the Clovis Defendants disclosed in their public communications [appeared to be] misleading."

12. To make matters worse, in 2015, the Individual Defendants negligently filed a materially misleading proxy statement, which urged stockholders to vote to re-elect certain directors. The proxy statement, however, misleadingly assured investors that Clovis' Board of Directors (the "Board") adequately oversees and monitors: (i) the quality and integrity of the Company's financial statements and other disclosures; (ii) Clovis' compliance with legal and regulatory requirements; and (iii) the Company's internal controls. The proxy statement also misleadingly assured investors that senior management and every member of the Board conducts themselves in accordance with the Company's Code of Business Ethics, including by complying with all applicable governmental rules and regulations, and by fully, fairly, accurately, and timely disclosing material information in Clovis' SEC filings.

13. Plaintiff brings this action against the Individual Defendants to repair the harm that they caused with their faithless actions.

## JURISDICTION AND VENUE

14. Pursuant to 28 U.S.C. §1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

15. This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this

District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

16. Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) Clovis maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

### Plaintiff

17. Plaintiff Wenduo Guo was a stockholder of Clovis at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Clovis stockholder.

### Nominal Defendant

18. Nominal defendant Clovis is a Delaware corporation with principal executive offices located at 5500 Flatiron Parkway, Suite 100, Boulder, Colorado. Clovis is a biopharmaceutical company focused on acquiring, developing, and commercializing innovative anti-cancer agents in the United States, Europe, and additional international markets. For years, the Company had three product candidates in clinical development: rociletinib for lung cancer, rucaparib for ovarian cancer, and lucitanib for breast cancer. Clovis has received Breakthrough

Therapy designation from the FDA for rociletinib and Rucaparib. As of February 22, 2016, the Company had 309 full-time employees.

**Defendants**

19. Defendant Patrick J. Mahaffy ("Mahaffy") is a co-founder of Clovis and its President, Chief Executive Officer, and a director and has been since April 2009. Defendant Mahaffy is named as a defendant in related securities class action complaints that allege he violated sections 10(b) and 20(a) of the Exchange Act and sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"). Defendant Mahaffy knowingly, recklessly, or with gross negligence: (i) fostered a culture of lawlessness and unethical behavior at Clovis; (ii) caused or allowed Clovis to operate for years with significant deficiencies in its drug trial controls and reporting controls; (iii) caused or allowed Clovis to fail to comply with FDA rules and regulations concerning drug trial data and reporting; (iv) failed to ensure the Company's clinical data was accurately presented to the FDA and to the investing public; and (v) caused or allowed the Individual Defendants to make improper public statements about Clovis' business, including with respect to the Offering. Defendant Mahaffy also negligently violated section 14(a) of the Exchange Act by causing Clovis to make misleading statements in the 2015 Proxy (as defined herein). Clovis paid defendant Mahaffy the following compensation as an executive:

| Year | Salary | Bonus | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2015 | $563,750 | - | $5,091,720 | $15,522 | $5,670,992 |
| 2014 | $544,167 | $357,500 | $9,206,220 | $15,146 | $10,123,033 |

20. Defendant Daniel W. Muehl ("Muehl") is Clovis' Senior Vice President of Finance and has been since September 2016, and Principal Financial Officer and Accounting

Officer and has been since March 2016. Defendant Muehl was also Vice President of Finance from 2015 to September 2016. Defendant Muehl knowingly, recklessly, or with gross negligence: (i) fostered a culture of lawlessness and unethical behavior at Clovis; (ii) caused or allowed Clovis to operate for years with significant deficiencies in its drug trial controls and reporting controls; (iii) caused or allowed Clovis to fail to comply with FDA rules and regulations concerning drug trial data and reporting; (iv) failed to ensure the Company's clinical data was accurately presented to the FDA and to the investing public; and (v) caused or allowed the Individual Defendants to make improper public statements about Clovis' business, including with respect to the Offering.

21. Defendant Gillian C. Ivers-Read ("Ivers-Read") is a co-founder of Clovis and its Chief Regulatory Officer and Executive Vice President of Technical Operations and has been since April 2009. Defendant Ivers-Read is named as a defendant in a related securities class action complaint that alleges she violated sections 10(b) and 20(a) of the Exchange Act and sections 11, 12(a)(2), and 15 of the Securities Act. Defendant Ivers-Read knowingly, recklessly, or with gross negligence: (i) fostered a culture of lawlessness and unethical behavior at Clovis; (ii) caused or allowed Clovis to operate for years with significant deficiencies in its drug trial controls and reporting controls; (iii) caused or allowed Clovis to fail to comply with FDA rules and regulations concerning drug trial data and reporting; (iv) failed to ensure the Company's clinical data was accurately presented to the FDA and to the investing public; and (v) caused or allowed the Individual Defendants to make improper public statements about Clovis' business, including with respect to the Offering. Clovis paid defendant Ivers-Read the following compensation as an executive:

| Year | Salary | Bonus | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2015 | $410,000 | $61,182 | $1,782,102 | $26,423 | $2,279,707 |
| 2014 | $395,217 | $180,000 | $3,222,177 | $26,093 | $3,823,487 |

22. Defendant M. James Barrett ("Barrett") is Clovis' Chairman of the Board and has been since at least April 2012 and a director and has been since April 2009. Defendant Barrett is the Chair of Clovis' Nominating and Corporate Governance Committee and a member of the Compensation Committee and has been since at least April 2014. Defendant Barrett is named as a defendant in a related securities class action complaint that alleges he violated sections 11, 12(a)(2), and 15 of the Securities Act. Defendant Barrett knowingly or recklessly: (i) fostered a culture of lawlessness and unethical behavior at Clovis; (ii) caused or allowed Clovis to operate for years with significant deficiencies in its drug trial controls and reporting controls; (iii) caused or allowed Clovis to fail to comply with FDA rules and regulations concerning drug trial data and reporting; (iv) failed to ensure the Company's clinical data was accurately presented to the FDA and to the investing public; and (v) caused or allowed the Individual Defendants to make improper public statements about Clovis' business, including with respect to the Offering. Defendant Barrett also negligently violated section 14(a) of the Exchange Act by causing Clovis to make misleading statements in the 2015 Proxy. Clovis paid defendant Barrett the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2015 | $79,938 | $562,399 | $642,337 |
| 2014 | $62,000 | $357,862 | $419,862 |

23. Defendant Brian G. Atwood ("Atwood") is a Clovis director and has been since April 2009. Defendant Atwood is a member of Clovis' Audit and Nominating and Corporate

Governance Committees and has been since at least April 2014. Defendant Atwood is named as a defendant in a related securities class action complaint that alleges he violated sections 11, 12(a)(2), and 15 of the Securities Act. Defendant Atwood knowingly or recklessly: (i) fostered a culture of lawlessness and unethical behavior at Clovis; (ii) caused or allowed Clovis to operate for years with significant deficiencies in its drug trial controls and reporting controls; (iii) caused or allowed Clovis to fail to comply with FDA rules and regulations concerning drug trial data and reporting; (iv) failed to ensure the Company's clinical data was accurately presented to the FDA and to the investing public; and (v) caused or allowed the Individual Defendants to make improper public statements about Clovis' business, including with respect to the Offering. Defendant Atwood also negligently violated section 14(a) of the Exchange Act by causing Clovis to make misleading statements in the 2015 Proxy. Clovis paid defendant Atwood the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2015 | $54,750 | $562,399 | $617,149 |
| 2014 | $53,000 | $357,862 | $410,862 |

24. Defendant James C. Blair ("Blair") is a Clovis director and has been since April 2009. Defendant Blair is the Chair of Clovis' Compensation Committee and a member of the Nominating and Corporate Governance Committee and has been since at least April 2014. Defendant Blair knowingly or recklessly: (i) fostered a culture of lawlessness and unethical behavior at Clovis; (ii) caused or allowed Clovis to operate for years with significant deficiencies in its drug trial controls and reporting controls; (iii) caused or allowed Clovis to fail to comply with FDA rules and regulations concerning drug trial data and reporting; (iv) failed to ensure the Company's clinical data was accurately presented to the FDA and to the investing public; and (v)

caused or allowed the Individual Defendants to make improper public statements about Clovis' business, including with respect to the Offering. Defendant Blair also negligently violated section 14(a) of the Exchange Act by causing Clovis to make misleading statements in the 2015 Proxy. Clovis paid defendant Blair the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2015 | $59,375 | $562,399 | $621,774 |
| 2014 | $55,000 | $357,862 | $412,862 |

25. Defendant Paul H. Klingenstein ("Klingenstein") is a Clovis director and has been since April 2009. Defendant Klingenstein is a member of Clovis' Audit Committee and has been since at least April 2014. Defendant Klingenstein is named as a defendant in a related securities class action complaint that alleges he violated sections 11, 12(a)(2), and 15 of the Securities Act. Defendant Klingenstein knowingly or recklessly: (i) fostered a culture of lawlessness and unethical behavior at Clovis; (ii) caused or allowed Clovis to operate for years with significant deficiencies in its drug trial controls and reporting controls; (iii) caused or allowed Clovis to fail to comply with FDA rules and regulations concerning drug trial data and reporting; (iv) failed to ensure the Company's clinical data was accurately presented to the FDA and to the investing public; and (v) caused or allowed the Individual Defendants to make improper public statements about Clovis' business, including with respect to the Offering. Defendant Klingenstein also negligently violated section 14(a) of the Exchange Act by causing Clovis to make misleading statements in the 2015 Proxy. Clovis paid defendant Klingenstein the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2015 | $49,750 | $562,399 | $612,149 |

| | | | |
|---|---|---|---|
| 2014 | $48,000 | $357,862 | $405,862 |

26. Defendant Edward J. McKinley ("McKinley") is a Clovis director and has been since April 2009. Defendant McKinley is the Chair of Clovis' Audit Committee and a member of that committee and has been since at least April 2014. Defendant McKinley is named as a defendant in a related securities class action complaint that alleges he violated Sections 11, 12(a)(2), and 15 of the Securities Act. Defendant McKinley knowingly or recklessly: (i) fostered a culture of lawlessness and unethical behavior at Clovis; (ii) caused or allowed Clovis to operate for years with significant deficiencies in its drug trial controls and reporting controls; (iii) caused or allowed Clovis to fail to comply with FDA rules and regulations concerning drug trial data and reporting; (iv) failed to ensure the Company's clinical data was accurately presented to the FDA and to the investing public; and (v) caused or allowed the Individual Defendants to make improper public statements about Clovis' business, including with respect to the Offering. Defendant McKinley also negligently violated section 14(a) of the Exchange Act by causing Clovis to make misleading statements in the 2015 Proxy. Clovis paid defendant McKinley the following compensation as a director:

| **Fiscal Year** | **Fees Paid in Cash** | **Option Awards** | **Total** |
|---|---|---|---|
| 2015 | $59,500 | $562,399 | $621,899 |
| 2014 | $56,000 | $357,862 | $413,862 |

27. Defendant Thorlef Spickschen ("Spickschen") is a Clovis director and has been since April 2009. Defendant Spickschen is a member of Clovis' Compensation Committee and has been since at least April 2014. Defendant Spickschen knowingly or recklessly: (i) fostered a culture of lawlessness and unethical behavior at Clovis; (ii) caused or allowed Clovis to operate for years with significant deficiencies in its drug trial controls and reporting controls; (iii) caused

or allowed Clovis to fail to comply with FDA rules and regulations concerning drug trial data and reporting; (iv) failed to ensure the Company's clinical data was accurately presented to the FDA and to the investing public; and (v) caused or allowed the Individual Defendants to make improper public statements about Clovis' business, including with respect to the Offering. Defendant Spickschen also negligently violated section 14(a) of the Exchange Act by causing Clovis to make misleading statements in the 2015 Proxy. Clovis paid defendant Spickschen the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2015 | $47,188 | $562,399 | $609,587 |
| 2014 | $45,000 | $357,862 | $402,862 |

28. Defendant Keith Flaherty ("Flaherty") is a Clovis director and has been since June 2013. Defendant Flaherty is a member of Clovis' Nominating and Corporate Governance Committee and has been since December 2014. Defendant Flaherty knowingly or recklessly: (i) fostered a culture of lawlessness and unethical behavior at Clovis; (ii) caused or allowed Clovis to operate for years with significant deficiencies in its drug trial controls and reporting controls; (iii) caused or allowed Clovis to fail to comply with FDA rules and regulations concerning drug trial data and reporting; (iv) failed to ensure the Company's clinical data was accurately presented to the FDA and to the investing public; and (v) caused or allowed the Individual Defendants to make improper public statements about Clovis' business, including with respect to the Offering. Defendant Flaherty also negligently violated section 14(a) of the Exchange Act by causing Clovis to make misleading statements in the 2015 Proxy. Clovis paid defendant Flaherty the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2015 | $45,000 | $562,399 | $607,399 |
| 2014 | $40,417 | $357,862 | $398,279 |

29. Defendant Ginger L. Graham ("Graham") is a Clovis director and has been since June 2013. Defendant Graham is a member of Clovis' Compensation Committee and has been since December 2014. Defendant Graham knowingly or recklessly: (i) fostered a culture of lawlessness and unethical behavior at Clovis; (ii) caused or allowed Clovis to operate for years with significant deficiencies in its drug trial controls and reporting controls; (iii) caused or allowed Clovis to fail to comply with FDA rules and regulations concerning drug trial data and reporting; (iv) failed to ensure the Company's clinical data was accurately presented to the FDA and to the investing public; and (v) caused or allowed the Individual Defendants to make improper public statements about Clovis' business, including with respect to the Offering. Defendant Graham also negligently violated section 14(a) of the Exchange Act by causing Clovis to make misleading statements in the 2015 Proxy. Clovis paid defendant Graham the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2015 | $47,188 | $562,399 | $609,587 |
| 2014 | $40,417 | $357,862 | $398,279 |

30. Defendant Erle T. Mast ("Mast") was a co-founder of Clovis and served as the Company's Chief Financial Officer and Executive Vice President from April 2009 to March 2016. Defendant Mast is named as a defendant in related securities class action complaints that allege he violated sections 10(b) and 20(a) of the Exchange Act and sections 11, 12(a)(2), and 15 of the Securities Act. Defendant Mast knowingly, recklessly, or with gross negligence: (i)

fostered a culture of lawlessness and unethical behavior at Clovis; (ii) caused or allowed Clovis to operate for years with significant deficiencies in its drug trial controls and reporting controls; (iii) caused or allowed Clovis to fail to comply with FDA rules and regulations concerning drug trial data and reporting; (iv) failed to ensure the Company's clinical data was accurately presented to the FDA and to the investing public; and (v) caused or allowed the Individual Defendants to make improper public statements about Clovis' business, including with respect to the Offering. Clovis paid defendant Mast the following compensation as an executive:

| Year | Salary | Bonus | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2015 | $410,000 | $61,182 | $1,782,102 | $15,522 | $2,268,806 |
| 2014 | $395,217 | $180,000 | $3,222,177 | $15,146 | $3,812,540 |

31. Defendant Andrew R. Allen ("Allen") was a co-founder of Clovis and served as the Company's Chief Medical Officer and Executive Vice President of Clinical and Pre-Clinical Development from April 2009 to July 2015. Defendant Allen is named as a defendant in a related securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act and sections 11, 12(a)(2), and 15 of the Securities Act. Defendant Allen knowingly, recklessly, or with gross negligence: (i) fostered a culture of lawlessness and unethical behavior at Clovis; (ii) caused or allowed Clovis to operate for years with significant deficiencies in its drug trial controls and reporting controls; (iii) caused or allowed Clovis to fail to comply with FDA rules and regulations concerning drug trial data and reporting; (iv) failed to ensure the Company's clinical data was accurately presented to the FDA and to the investing public; and (v) caused or allowed the Individual Defendants to make improper public statements about Clovis' business, including with respect to the Offering. Clovis paid defendant Allen the following compensation as an executive:

| Year | Salary | Bonus | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2015 | $324,578 | - | $4,644,470 | $13,121 | $4,982,169 |
| 2014 | $441,350 | $202,500 | $3,222,177 | $15,474 | $3,881,501 |

32. The defendants identified in ¶¶19-21, 30-31 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶19, 22-29 are referred to herein as the "Director Defendants." The defendants identified in ¶¶22-24, 28 are referred to herein as the "Nominating and Corporate Governance Committee Defendants." Collectively, the defendants identified in ¶¶19-31 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

33. By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Clovis and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Clovis in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Clovis and not in furtherance of their personal interest or benefit.

34. To discharge their duties, the officers and directors of Clovis were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Clovis were required to, among other things:

(a) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects;

(b) conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations; and

(c) remain informed as to how Clovis conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**Additional Duties Pursuant to the Company's Code of Business Ethics**

35. Clovis' Code of Business Ethics (the "Code") is purportedly intended to provide "a clear understanding of the principles of business conduct and ethics that are expected of … every full and part-time employee of the Company and its subsidiaries, all members of the Company's senior management, including the Company's Chief Executive Officer and Chief Financial Officer, and every member of the Company's Board of Directors, even if such member is not employed by the Company." According to the Code, if anyone violates ethical business standards or "fail[s] to exercise appropriate supervision or oversight to detect and report such behavior … he or she can expect a disciplinary response, up to and including termination of any employment or other relationship with the Company, and possibly other legal action." Moreover, the Company requires that all officers and directors must "be honest, fair, and accountable in all business dealings and obligations, and to ensure [among other things]":

- Full, fair, accurate, timely and understandable disclosure in the reports required to be filed by the Company with the Securities and Exchange Commission; and

- Compliance with applicable governmental rules and regulations.

**Additional Duties of the Nominating and Corporate Governance Committee Defendants**

36. The Nominating and Corporate Governance Committee Defendants, defendants Atwood, Barrett, Blair, and Flaherty, also owed additional specific duties to Clovis. The Nominating and Corporate Governance Committee Defendants were tasked with "develop[ing] and oversee[ing] the effectiveness of the Company's legal, ethics, and regulatory compliance matters." Moreover, the Nominating and Corporate Governance Committee Defendants were specifically tasked with various compliance matters, and were required to, among other things:

- Provide general compliance oversight and periodically receive updates about the compliance program from the Corporate Compliance Officer;
- Review the status and effectiveness of the Company's compliance programs with respect to non-financial regulatory requirements;

* * *

- Serve as the committee to whom violations are to be reported, and investigate alleged misconduct;
- Establish, review and update periodically the Company's Code of Business Ethics and ensure that management has established a system to implement a training system around the code and enforce the Code; and
- Periodically review with the Company's management any legal matters that could have a significant impact on the Company, including but not limited to, government investigations, *qui tam* lawsuits, other laws and regulations affecting the Company's manufacture, distribution and sale of its products worldwide and other claims relating to actual or alleged regulatory or compliance matters.

**Breaches of Duties**

37. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Clovis, the absence of good faith on their part, and a reckless disregard for their duties to the Company that

the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

38. The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to misrepresent its business prospects for years, including with respect to the safety and efficacy of Clovis' primary drug in the Company's pipeline. Defendants further failed to implement proper internal controls to ensure the Company followed proper and well-known drug testing and reporting standards, and to ensure material information was adequately and timely disclosed to the SEC and investing public. These improper practices caused Clovis to incur substantial damage.

39. The Individual Defendants, because of their positions of control and authority as officers and/or directors of Clovis, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. As a result, and in addition to the damage the Company has already incurred, Clovis has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

40. In committing the wrongful acts alleged herein, the defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the defendants further aided and abetted and/or assisted each other in breaching their respective duties.

41. The purpose and effect of the defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise their violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations.

42. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

43. Each of the defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## BACKGROUND

44. Clovis is biopharmaceutical company focused on acquiring, developing, and commercializing cancer treatments in the United States, Europe, and additional international markets. The Company's development programs are targeted at specific subsets of cancer. For years, Clovis had no marketed products, with a pipeline of just three drugs, including rociletinib, rucaparib, and lucitanib.[2] As such, Clovis has long been heavily reliant on investor capital to keep the Company afloat and fund research.

[2] The Company recently released its first marketed product, Rubraca™ (rucaparib).

45. For years, rociletinib was the most important drug in Clovis' pipeline, and was presented to investors as a breakthrough therapy in the treatment of lung cancer for patients who develop resistance to front-line treatments, an estimated $3 billion untapped market. Typically, the front-line lung cancer treatment drugs are designed to inhibit mutated cells from indiscriminately multiplying and proliferating tumor growth. The majority of patients treated with these front-line drugs, however, develop a resistance to the treatment within about a year. In approximately 60% of such resistance cases, the resistance to treatment is caused by a secondary mutation which changes certain cell structures and eliminates the effectiveness of front-line treatments. Rociletinib was supposed to provide an effective treatment for these patients who exhibited resistance due to the secondary mutation.

46. When Clovis first began testing rociletinib, the $3 billion market for the drug lacked any apparent competition. By late 2013, however, a potential rival began to emerge. Specifically, pharmaceutical giant AstraZeneca disclosed that it was developing a competing drug called Tagrisso. As defendant Mahaffy acknowledged during an October 31, 2013 earnings call, Clovis was "in a race [with AstraZeneca,] a very able competitor with an active drug." Thus, in order to effectively compete with AstraZeneca, Clovis needed to demonstrate that rociletinib was at least as effective as Tagrisso.

47. In or about early 2014, Clovis began a Phase II[3] clinical trial for reciletinib called TIGER-X, and thereafter began an additional efficacy Phase II trial called TIGER-2. The

[3] The purpose of Phase II trials is to test the efficacy and safety of drug candidates for potential FDA approval.

TIGER-X and TIGER-2 trials were "open label" studies, meaning the trial data was unblinded and fully available to Clovis and the Individual Defendants throughout the lives of the studies.

48. The single most critical metric of both TIGER trials was rociletinib's objective response rate, or ORR. ORR, which describes the percentage of patients who experience clinically meaningful tumor shrinkage, is widely considered to be the most meaningful biomarker supporting a drug's utility as a measure of promising treatment effect in Phase II screening trials.

49. The rules for calculating ORR are explicitly defined in the definitive cancer trial standards known as RECIST. RECIST expressly states that each observation of tumor shrinkage (or "response") ***must be "confirmed" by subsequent observation***. If a response is not confirmed, it cannot be included in the calculation of ORR, because confirmation is essential to ensuring that reported results are reliable, reproducible, and do not overstate a drug's efficacy.

50. Clovis expressly incorporated RECIST guidelines into the TIGER-X and TIGER-2 protocols, thus was required to only calculate ORR using confirmed responses. Indeed, the Company publicly disclosed that the primary objective of both trials was "[t]o evaluate tumor response" with a primary endpoint of "ORR and duration of response per RECIST Version 1.1." The TIGER protocols themselves also defined the studies' primary endpoint as ORR "per RECIST Version 1.1." The protocols further stated that "[t]he efficacy endpoints will be evaluated using RECIST Version 1.1" and that "[t]umor response will be interpreted using RECIST Version 1.1."[4]

[4] The TIGER-X protocols further explicitly stated that tumor assessments would be performed "at screening; at the end of Cycles 2, 4, and 6 (between Days 14 and 21); every 3 cycles after

**THE INDIVIDUAL DEFENDANTS CAUSED OR ALLOWED CLOVIS TO REPEATEDLY MISREPRESENT DATA AND MAKE IMPROPER STATEMENTS CONCERNING THE SAFETY AND EFFICACY OF ROCILETINIB**

51. As detailed below, for years, the Individual Defendants repeatedly misrepresented that rociletinib was performing exceptionally well in the TIGER trials with strong safety and an impressive ORR of about 60%. The Individual Defendants further repeatedly misrepresented these impressive results were based on confirmed responses per RECIST.

52. On May 31, 2014, a few weeks after AstraZeneca reported a confirmed ORR for Tagrisso of at least 56%, Clovis presented at the 2014 American Society of Clinical Oncology ("ASCO") medical conference and reported the first rociletinib efficacy results from the Company's Phase II TIGER-X trial. Specifically, the Company reported that rociletinib exhibited an impressive "58% objective response rate" in the Company's targeted patients who had developed a secondary mutation resistance to front-line lung cancer drugs, and further expressly stated that the ORR was evaluated "per RECIST v1.1."

53. Also on May 31, 2014, the Company issued a press release that was shortly thereafter filed on Form 8-K with the SEC reiterating rociletinib's purported 58% ORR without disclosing that the results were primarily unconfirmed, while defendant Mahaffy proclaimed that Clovis was "extremely pleased with the consistency of the efficacy demonstrated to date, the growing evidence of a lengthy duration of benefit and that [rociletinib] is so well-tolerated with a manageable side effect profile." The press release stated:

---

Cycle 6 (between Days 14 and 21); and at the end-of-study visit." Moreover, each "Cycle" lasted twenty-one days.

CLOVIS ONCOLOGY'S CO-1686 DEMONSTRATES COMPELLING CLINICAL ACTIVITY AND PROGRESSION-FREE SURVIVAL (PFS) IN UPDATED PHASE 1/2 STUDY RESULTS IN PATIENTS WITH EGFR-MUTANT NON-SMALL CELL LUNG CANCER (NSCLC)

- ***58% objective response rate*** observed to date in 40 evaluable heavily-pretreated T790M+ patients in Phase 1 and early Phase 2 expansion cohorts
- Current estimate of median PFS greater than 12 months in T790M+ patient population; observed median not yet reached
- ***Well-tolerated*** – majority of treatment-related adverse events are grade 1-2 and manageable
- Only TKI to completely spare wild-type EGFR signaling
- Breakthrough Therapy designation granted by FDA earlier this month
- New Drug Application (NDA) submission planned by mid-2015

CHICAGO--(BUSINESS WIRE)--May 31, 2014-- Clovis Oncology (NASDAQ:CLVS) announced today updated findings from the Phase 1 and early Phase 2 portions of its ongoing Phase 1/2 clinical study of CO-1686, the Company's novel, oral, targeted covalent (irreversible) inhibitor of mutant forms of the epidermal growth factor receptor (EGFR) for the treatment of non-small cell lung cancer in patients with initial activating EGFR mutations as well as the dominant resistance mutation T790M. These data are being presented today in an oral presentation by Dr. Lecia Sequist at the 2014 American Society of Clinical Oncology (ASCO) annual meeting in Chicago.

"Currently, there are no approved treatments for EGFR patients with acquired resistance to targeted therapy," said Lecia V. Sequist, MD, MPH, Massachusetts General Hospital Cancer Center and Associate Professor of Medicine at Harvard Medical School and the lead investigator for the Phase 1/2 study of CO-1686. "This ever-growing population of patients is in dire need of effective agents. The initial experience with CO-1686 provides hope that we are finally entering an era where we may be able to successfully target resistance to EGFR inhibitors."

"In the year since our first presentation of clinical data for CO-1686, ***we have made great strides in the development of this drug***," said Patrick J. Mahaffy, President and CEO of Clovis Oncology. "***We are extremely pleased with the consistency of the efficacy demonstrated to date, the growing evidence of a lengthy duration of benefit and that CO-1686 is so well-tolerated with a manageable side effect profile***. Additionally, the receipt of Breakthrough

Therapy Designation from FDA earlier this month supports our commitment to file an NDA by mid-2015 and make this drug available to treating physicians and the patients that may benefit as rapidly as possible."

The Phase 1 dose escalation portion of the study is being conducted in the United States, France and Australia in patients with metastatic or unresectable recurrent NSCLC and a documented EGFR mutation. Patients were not required to be T790M positive for the Phase 1 portion of the study but had to have progressed on prior EGFR-directed tyrosine kinase inhibitor (TKI) therapy (prior chemotherapy was also allowed).

The two Phase 2 expansion cohorts are currently enrolling in the United States, Europe, and Australia in EGFR mutant patients with the T790M mutation. The first cohort includes approximately 150 to 200 T790M positive patients directly after progression on their first and only TKI therapy, comparable to the population planned for the TIGER2 registration study. The second cohort includes approximately 150 to 200 later-line T790M positive patients after progression on their second or later TKI therapy or subsequent chemotherapy. Both cohorts are exploring doses of 500mg, 625mg and 750mg BID.

Approximately 160 patients have been treated with CO-1686 to date across all dosing cohorts in the trial. Data from 81 evaluable patients treated with CO-1686 at efficacious doses (comprising patients treated with 900mg BID of freebase or any dose of the hydrobromide salt (HBr) formulation) were presented today, including 72 from the Phase 1 study and nine from the early part of the Phase 2 portion of the study. Of these 81 patients, 40 are centrally-confirmed T790M positive.

Patients enrolled in the Phase 1 study were heavily pretreated prior to receiving CO-1686; 75 percent of patients across all doses had immediately progressed on TKI therapy prior to CO-1686 treatment. The median number of previous lines of therapy across patients at all doses was three; the median number of previous TKI lines was two.

**Evidence of Activity**

In the 40 evaluable centrally-confirmed T790M positive patients across efficacious dose levels in the Phase 1 dose-expansion study and the early Phase 2 expansion cohorts, 23 partial responses (PRs) have been observed to date, for ***a 58 percent objective response rate (ORR)***. Thirty-six of the 40 evaluable T790M positive patients, or 90 percent, have experienced stable disease or a PR. Central nervous system (CNS) responses have also been observed in heavily pre-treated T790M positive patients.

> The median duration of response cannot yet be determined in the T790M positive patients. Similarly, median PFS has not been reached. However, follow-up for some patients exceeds one year, and the current estimate for median PFS is greater than 12 months.
>
> **Safety and Tolerability**
>
> CO-1686 is ***well-tolerated***, with no evidence of systemic wild-type EGFR inhibition. In the Phase 1 study, the most common adverse events were nausea, hyperglycemia, diarrhea, vomiting and decreased appetite, and these were mostly grade 1 or 2 in severity. The most common grade 3 adverse event was hyperglycemia, which was observed in 22 percent of patients. Hyperglycemia, when observed and requiring treatment, is typically managed with a commonly-prescribed single oral agent.

54. At the ASCO medical conference, defendant Allen, co-founder of Clovis and the Company's then Chief Medical Officer, repeated that rociletinib exhibited a "58 percent objective response rate" in patients who had developed a secondary mutation resistance across all rociletinib doses, and also explicitly reminded investors that "the primary outcome for Phase 2 is objective response rates with duration of response ***using RECIST 1.1***." In other words, by definition of RECIST standards, defendant Allen specifically assured investors that the ORRs were ***confirmed***.

55. On August 7, 2014, Clovis issued a press release that was shortly thereafter filed on Form 8-K with the SEC. The press release again misleadingly touted that "patients treated at a therapeutic dose of rociletinib included a 58 percent objective response rate." The same day, defendant Mahaffy reiterated rociletinib's purported 58% ORR during a conference call with investors, and further boasted that this seemingly impressive ORR was one of the "[h]ighlights of the data presented at ASCO." Defendant Mahaffy further expressed that Clovis was seeing "clear evidence of meaningful activity in [tested] patients," that the Company was "extremely enthusiastic about moving the rociletinib program forward rapidly [and] ensuring it can be

approved and made available for the large number of patients for whom it may provide benefit," and that the "[TIGER studies] remain on track … to serve as the basis for NDA submission by mid-2015." Finally, defendant Mahaffy assured investors that "[t]he data are open to [Clovis]," and that the Company would "continue to provide updates [because Clovis] know[s] that's important to investors."

56. On September 9, 2014, Clovis participated in the annual Morgan Stanley Healthcare Conference. Defendant Mahaffy again suggested that rociletinib's ORR was approximately 60%, by stating that the drug had a "similar response rate" to Tagrisso, which had long been reporting an approximate 60% response for resistant patients.

57. On November 18, 2014, a few days before the 26th EORTC-NCI-AACR[5] Symposium on Molecular Targets and Cancer Therapeutics (the "ENA Symposium"), Clovis issued a press release boasting that rociletinib demonstrated an impressive ORR of more than 60% at two different doses for which the Company planned to seek approval, including 500mg and 625mg twice-daily or, "BID". In particular, the press release stated:

> **Evidence of Activity**
>
> The objective response rate (ORR) in 27 evaluable T790M-positive patients receiving either 625 or 500mg BID was 67%. The ORR was comparable in the 625mg BID and the 500mg BID dose groups.

58. On November 21, 2014, Clovis presented the above results at the ENA Symposium, a global drug development and research meeting attended by thousands of academics, scientists, and pharmaceutical industry representatives, which is jointly hosted by the

---

[5] The European Organisation for the Research and Treatment of Cancer ("EORTC"), the National Cancer Institute ("NCI"), and American Association for Cancer Research ("AACR").

EORTC, NCI, and AACR. During the symposium, the presentation from Clovis grossly misrepresented that the Company observed "***durable RECIST responses***, particularly in [patients who had developed a secondary mutation resistance]." The presentation failed to disclose that the ORRs were unconfirmed, as required per RECIST's definition of ORR, and misrepresented the "durability" of the responses given that the responses were unconfirmed and thus lacked any credible evidence of "durability." Later the same day, defendant Mahaffy touted rociletinib's purported "strong response rates" during an ENA Symposium update conference call with investors.

59. By early 2015, the principal side effects of Tagrisso, rociletinib's closest competition, were becoming more evident and included rash and diarrhea, which many doctors viewed as significantly detrimental to patients' quality of life. At the same time, the response rates that were being reported for Tagrisso and rociletinib ***appeared*** fairly comparable (due to Clovis' misrepresentations) at around 60%. Thus, in order to distinguish rociletinib from Tagrisso, the Individual Defendants began to increasingly tout rociletinib's supposedly strong safety profile. As was later revealed by the FDA, however, by no later than January 2015, Clovis' data showed that rociletinib patients experienced a greater risk of "QT prolongation," a delayed heart repolarization that increases the risk of serious and fatal cardiac arrhythmias and sudden cardiac death. In fact, by that time, rociletinib patients had experienced at least two sudden deaths, at least three cases of serious ventricular tachyarrhythmia, and at least one case of serious arrhythmia known as Torsades de pointes.

60. On February 12, 2015, at an investor conference, defendant Mast proclaimed that rociletinib had a "very manageable side effect profile" and the "primary side effect that comes

with rociletinib that is easily managed is hyperglycemia." Similarly, during a May 6, 2015 earnings conference call, defendant Mahaffy boasted that "[o]verall, rociletinib is well tolerated with treatment related adverse events generally infrequent and mild, with the only grade 3 adverse event of note, hyperglycemia, which when observed and requiring treatment is typically managed with a commonly prescribed single oral agent."

61. On April 30, 2015, Clovis published data from the TIGER-X trial in one of the most widely read medical journals, the *New England Journal of Medicine*. The article, which was co-authored by defendant Allen, again presented misleading ORR results, including a purported 59% ORR across all rociletinib doses in patients who had developed a secondary mutation resistance. The article failed to disclose that such responses were ***not*** confirmed, and further continued to misrepresent that "[t]umor response was assessed according to the Response Evaluation Criteria in Solid Tumors (RECIST), version 1.1," which by definition requires confirmed responses.

62. On May 31, 2015, in anticipation of the Company's upcoming $300 million public Offering, Clovis presented data at the 2015 ASCO medical conference. The data was purportedly a preview of the dataset the Company would ultimately submit to the FDA for the rociletinib NDA. During the presentation, the Individual Defendants continued to grossly misrepresent rociletinib's efficacy and safety profile. In particular, the presentation claimed that for patients who had developed a secondary mutation resistance, Clovis had observed an "ORR of 60%" at the "recommended dose" of 500mg BID, "demonstrat[ing] compelling activity," and a 54% ORR at the step-up dose of 625mg.

63. The same day, defendants participated in a conference call with investors. Defendant Allen boasted that the Company had "***very consistently*** shown an objective response rate of around 60%" in patients who had developed a secondary mutation resistance. Defendant Allen again failed to disclose that most responses were not confirmed, and instead wrongfully touted that Clovis had "seen these ***consistent responses*** with ***durable*** patient benefit in now a large, very advanced western patient population using our commercial drug formulation."

64. Clovis also issued a press release on May 31, 2015, trumpeting similar impressive results for rociletinib. Specifically, the press release proclaimed rociletinib had a "60% overall response rate," and was "[w]ell-tolerated." The press release further stated the results were "consistent and promising" and quoted defendant Mahaffy stating that "***responses and durability of this magnitude in a very advanced U.S. patient population … is extremely encouraging***." Defendant Mahaffy further stated that "[t]hese maturing data ***confirm*** rociletinib's compelling activity in patients with the most advanced stage of [certain] muta[tions]…." The press release stated:

> CLOVIS ONCOLOGY'S ROCILETINIB (CO-1686) PHASE 2 STUDY RESULTS DEMONSTRATE CONSISTENT AND PROMISING CLINICAL ACTIVITY AND DISEASE CONTROL IN VERY ADVANCED PATIENTS WITH EGFR-MUTANT NON-SMALL CELL LUNG CANCER (NSCLC)
>
> - ***60% overall response rate*** (ORR) and 90% disease control rate (DCR) in heavily pretreated centrally confirmed tissue T790M-positive patients
> - Median progression free survival (PFS) of 10.3 months observed in patients without a history of CNS metastases; median PFS of 8 months observed in overall population of 270 heavily pretreated centrally confirmed tissue T790M-positive patients, including 40% of patients with a history of CNS metastases
> - Compelling activity in T790M-negative disease with 37% ORR observed

- 57% ORR and 80% DCR in heavily pretreated centrally confirmed plasma-genotyped T790M-positive patients – may allow for broader testing for mutations in patients ineligible for tissue biopsy

- ***Well-tolerated***; only common grade 3 treatment-related adverse event (AE) observed is hyperglycemia

- Breakthrough Therapy designation granted by the U.S. FDA; U.S. and E.U. regulatory submissions to complete in July 2015

CHICAGO--(BUSINESS WIRE)--May 31, 2015-- Clovis Oncology (NASDAQ:CLVS) announced today updated findings from its Phase 2 clinical study of rociletinib (CO-1686), the Company's novel, oral, targeted covalent (irreversible) mutant-selective inhibitor of the epidermal growth factor receptor (EGFR) for the treatment of non-small cell lung cancer (NSCLC) in patients with initial activating EGFR mutations, as well as the dominant resistance mutation T790M. These data from the TIGER-X trial are being presented today in an oral presentation (Abstract #8001) at the 2015 American Society of Clinical Oncology (ASCO) annual meeting in Chicago.

"The ***maturing data for rociletinib confirm*** in a large patient population what we have seen in our early clinical experience," said Jonathan Goldman, MD, TIGER-X investigator and Assistant Professor, UCLA Hematology & Oncology, Associate Director of Drug Development and Director of Clinical Trials in Thoracic Oncology. "***Rociletinib has shown very encouraging and durable activity in the most advanced mutant EGFR lung cancer patients***, including in a large population of patients with CNS metastases. Importantly, the data continue to show activity in both T790M-positive and T790M-negative patients, which gives us a potential treatment option for all patients who have progressed on their initial EGFR targeted therapy."

"***To show responses and durability of this magnitude in a very advanced U.S. patient population, of whom nearly half have a history of CNS metastases, is extremely encouraging***," said Patrick J. Mahaffy, President and CEO of Clovis Oncology. "These ***maturing data confirm rociletinib's compelling activity*** in patients with the most advanced stage of mutant EGFR NSCLC and form the basis, along with additional data from TIGER-2, of our U.S. and E.U. regulatory filings beginning next month."

Data presented today are from the TIGER-X trial of 456 mutant EGFR NSCLC patients treated with rociletinib tablets at each of the efficacious dose groups studied (all doses BID): 500mg (n=119), 625mg (n=236), 750mg (n=95) and 1000mg (n=6) doses. Efficacy data from 243 centrally confirmed tissue T790M-

positive patients, 35 centrally confirmed tissue T790M-negative patients and 147 plasma T790M-positive patients were also presented.

The study is being conducted at sites in the U.S., Europe and Australia, with greater than 80 percent of study participants enrolled at U.S. sites.

Patients enrolled in trial were heavily pretreated prior to receiving rociletinib. Eighty-two percent of patients across all doses had immediately progressed on TKI therapy prior to rociletinib treatment. The median number of previous lines of therapy across patients at all doses was two. Seventy-two percent of patients had an ECOG performance score of one or higher.

Additionally, patients with stable CNS metastases were allowed in the trial. Forty-one percent of study participants had a history of CNS metastases, consistent with the study population being drawn largely from U.S. academic centers where more advanced patients are often referred for continuing management of progressive disease after standard therapy.

Data from this study, combined with data from the TIGER-2 study, will form the U.S. New Drug Application (NDA) and E.U. Marketing Authorization Application (MAA) submission packages in July.

**Evidence of Activity**

A total of 243 centrally confirmed tissue T790M-positive patients were evaluable in the four dose subgroups (all doses BID): 500mg (n=48), 625mg (n=114), 750mg (n=77) and 1000mg (n=4).

***At the recommended dose of 500mg, a 60 percent ORR*** and a 90 percent DCR was observed, and ***across all doses, a 53 percent ORR*** and an 85 percent DCR was observed.

At the time of analysis, a median PFS of 10.3 months was observed in 163 heavily pretreated centrally confirmed tissue T790M-positive patients without a history of CNS metastases, while a median PFS of 8 months was observed in 270 heavily pretreated centrally confirmed tissue T790M-positive patients, of whom 40 percent had a history of CNS metastases. Clinical benefit was durable with some patients on drug for over two years without disease progression. These data continue to mature.

A total of 147 evaluable plasma T790M-positive patients were treated with rociletinib; in those treated with 500mg, a 57 percent ORR and an 80 percent DCR has been observed to date, and at all doses, a 53 percent ORR and an 82 percent DCR has been observed, which is highly consistent with the comparable

> tissue outcomes data. These data suggest that T790M plasma testing may be an alternative to tissue testing.
>
> Rociletinib activity was also observed in 35 evaluable T790M-negative patients treated at all doses. A 37 percent ORR has been observed, in a range of 32 to 39 percent across doses studied. Eighty-six percent of these patients were treated with rociletinib directly after TKI therapy, so a TKI re-treatment effect cannot be the driver of this activity.
>
> **Safety and Tolerability**
>
> The ***data presented at ASCO continue to demonstrate rociletinib is well tolerated***. In the 500mg dose group, the most common treatment-related AEs reported in greater than 10 percent of all patients included hyperglycemia, diarrhea and nausea.
>
> Across all doses, most AEs were grade 1 or 2 in severity. The only common grade 3 treatment-related AE was hyperglycemia, which was observed in 17 percent of patients treated with rociletinib 500mg (20/119), 24 percent of patients treated with the 625mg dose (56/236), 36 percent of patients treated with the 750mg dose (34/95) and 33 percent of patients treated with the 1000mg dose (2/6). Most AEs appear to be dose dependent.
>
> Hyperglycemia was readily managed with commonly prescribed oral agents and grade 3 hyperglycemia rates have decreased over time as routine monitoring was standardized in the clinical program for rociletinib. Specifically, prior to September 2014, grade 3/4 hyperglycemia was observed in 22 percent of patients treated with rociletinib at 500mg. After September 2014, by which time routine monitoring had been implemented, grade 3 hyperglycemia was observed in only eight percent of such patients.
>
> No interstitial lung disease (ILD) was observed in the 500mg dose group. Across all doses, 1.5 percent (7/456) of patients developed ILD, and continuation of treatment with rociletinib was possible with the addition of steroid cover in recent cases. There have been no fatal cases of ILD.
>
> No paronychia or stomatitis was observed and any observed rash was minimal. Treatment-related AEs leading to drug discontinuation were observed in 2.5 percent of cases at the recommended dose of 500mg, and in four percent of overall cases.

65. According to documents recently published by the FDA, on June 9, 2015, just nine days after defendants publicly touted that rociletinib had "very consistently shown an

[ORR] of around 60%," Clovis privately met with the FDA and privately disclosed significantly lower response rates. In particular, according to the FDA, during the June 9, 2015 meeting, "Clovis provided preliminary investigator-assessed ORR by dose" and "[a]t the 500mg BID and 625mg BID dose levels, ***Clovis reported ORR of 50% (24/48) and 49% (73/150), respectively***." To make matters worse, even these numbers were grossly inaccurate because Clovis failed to inform the FDA that such ORR calculations were primarily based on unconfirmed responses. In any event, as detailed below, the Individual Defendants continued to publicly tout that rociletinib had a 60% ORR while also failing to disclose that the results were largely unconfirmed.

66. On June 22, 2015, less than two weeks after the pre-NDA meeting with the FDA, the Company abruptly announced that defendant Allen was resigning from Clovis "to create a new immune-oncology focused biotechnology company." Two days later, on June 24, 2015, Clovis filed its rolling NDA submission for rociletinib based on efficacy data primarily from the Phase II TIGER-X study.

67. On or about July 14, 2015, while Clovis' stock price was significantly inflated based on defendants' repeated misrepresentations and the recent NDA submission, the Company held the secondary Offering to sell over $316 million worth of stock at a price of approximately $78 per share. The Offering was conducted pursuant to a June 11, 2013, shelf registration statement filed with the SEC on Form S-3 and signed by defendants Mahaffy, Mast, Atwood, Barrett, Blair, Klingenstein, McKinley, and Spickschen. The prospectus supplement repeated substantially similar misrepresentations that the Individual Defendants had long touted. For example, the prospectus supplement boasted that data from the TIGER-X trial showed a "60 percent ORR" at the "recommended dose of 500mg" and "across all doses, a 53 percent ORR

[was] observed." The prospectus supplement further assured investors that the "[c]linical benefit" observed in the data was "durable" and "continue[d] to demonstrate rociletinib is well tolerated," that "[t]he only common grade 3 [side effect] was hyperglycemia," and that "hyperglycemia was readily managed with commonly prescribed oral agents."

68. As a result of the above misleading statements, the Offering raised more than $316 million from public investors. After underwriting commissions, the Company reaped net total proceeds of approximately $298 million.

69. On August 3, 2015, Clovis finalized the rolling NDA submission. Three days later, defendant Mahaffy touted to investors during a conference call that "with the $298 million equity offering we completed in July, we're well-capitalized to pursue our development and commercial objectives." Thereafter, the Individual Defendants continued to boast about rociletinib's impressive efficacy and safety profile.

70. On September 8, 2015, Clovis made a presentation at the World Conference on Lung Cancer. During the conference, the Company reiterated its claim that rociletinib's "ORR in [patients who had developed a secondary mutation resistance] at the 500mg BID dosing level was 60%."

71. The following week, defendant Mahaffy repeated these results at the Morgan Stanley Healthcare Conference and also claimed that "a very big positive is that [rociletinib] is the first and only mutant EGFR-directed therapy that doesn't cause rash and only a limited amount of diarrhea. ***So in terms of typical side effects ... we don't have them***."

72. In October 2015, defendants privately submitted rociletinib data to the FDA that substantially contradicted their repeated previous public statements. Shockingly, the data

showed ***confirmed ORRs of just 28%*** in patients who had developed a secondary mutation resistance taking the recommended 500mg dose, and a ***confirmed ORR of just 34%*** for similar patients taking the 625mg dose. In other words, the confirmed ORR for patients taking the 500mg dose was ***less than half of the 60% ORR*** defendants repeatedly touted, while the confirmed ORR for patients taking the 625mg dose was ***nearly 40% less than the 54% ORR*** repeatedly touted. Even more shocking, defendants continued to publicly misrepresent the data thereafter.

73. On November 5, 2015, Clovis issued a press release that was shortly thereafter filed on Form 8-K with the SEC announcing the Company's third quarter 2015 results. In the press release and during a follow up earnings conference call with investors, the Individual Defendants utterly failed to disclose the truth about the above misrepresentations and instead directed investors to view the previously misrepresented and inflated ORR data at the Company's website. Worse, even when specifically asked by investors whether the public had "seen everything that the FDA is going to see" regarding the TIGER trials, defendant Mahaffy refused to disclose the true ORRs for rociletinib. Instead, defendant Mahaffy responded, "I'm going to stick to what we've said before."

74. According to recently released FDA documents, on November 9, 2015, the FDA specifically informed Clovis of "its disagreement with Clovis' reported efficacy results … based on Clovis' inclusion of patients with unconfirmed responses in the efficacy assessment," and "Clovis acknowledged that [the Company's] efficacy analysis had included patients with unconfirmed responses." As such, the "FDA requested that Clovis submit additional datasets including updated tumor measurement raw datasets."

75. The very next day, on November 10, 2015, the Company's co-founder and then Chief Financial Officer, defendant Mast, attended the Credit Suisse Healthcare Conference and again misrepresented rociletinib's efficacy. Specifically, despite the Company's disclosures from the previous month to the FDA that rociletinib had confirmed ORRs of just 28% and 34%, respectively at the 500mg and 625mg doses, defendant Mast boasted that the "***majority*** of patients received some sort of clinical benefit from taking rociletinib."

## THE INDIVIDUAL DEFENDANTS CAUSE CLOVIS TO FILE MATERIALLY MISLEADING PROXY STATEMENT

76. On April 30, 2015, defendants Mahaffy, Atwood, Barrett, Blair, Flaherty, Graham, Klingenstein, McKinley, and Spickschen caused Clovis to file with the SEC its Proxy Statement on Schedule DEF 14A in connection with the 2015 Annual Meeting of Stockholders, held on June 11, 2015 (the "2015 Proxy"). In the 2015 Proxy, defendants solicited stockholder votes to, among other things, re-elect defendants Mahaffy, Barrett, and Spickschen to the Board. Defendants issued materially misleading statements with respect to these solicited votes.

77. The 2015 Proxy stated the following in support of re-electing the current directors:

> **Board's Role in Risk Oversight**
>
> Our audit committee is primarily responsible for overseeing our risk management processes on behalf of the full board of directors. The audit committee receives reports from management at least quarterly regarding our assessment of risks. In addition, the audit committee reports regularly to the full board of directors, which also considers our risk profile. ***The audit committee and the full board of directors focus on the most significant risks we face and our general risk management strategies***. While ***our board of directors oversees our risk management***, company management is responsible for day-to-day risk management processes. ***Our board of directors expects company management to consider risk and risk management in each business decision, to proactively develop and monitor risk management strategies and processes for day-to-day***

***activities and to effectively implement risk management strategies adopted by the audit committee and the board of directors***. We believe this division of responsibilities is the most effective approach for addressing the risks we face and that our board leadership structure, which also emphasizes the independence of the board in its oversight of our business and affairs, supports this approach.

* * *

**Audit Committee**

The members of the audit committee are Messrs. Atwood, Klingenstein, and McKinley, each of whom qualifies as an independent director under the corporate governance standards of the NASDAQ Stock Market and the independence requirements of Rule 10A-3 of the Exchange Act. Our board of directors has determined that Mr. McKinley qualifies as an "audit committee financial expert" as such term is defined in Item 407(d)(5) of Regulation S-K. Mr. McKinley serves as chairman of this committee. During the fiscal year 2014, our audit committee met four times, including telephonic meetings.

Our audit committee oversees a broad range of issues surrounding our accounting and financial reporting processes and audits of our financial statements, and assists our board of directors by: (1) overseeing and monitoring the quality and integrity of our financial statements, ***our compliance with legal and regulatory requirements and our internal accounting procedures and systems of internal controls*** (2) assuming direct responsibility for the appointment, compensation, retention and oversight of work of any independent registered public accounting firm engaged for the purpose of performing any audit, review or attestation services, for overseeing and monitoring our independent registered public accounting firm's qualifications and independence, and for dealing directly with any such accounting firm, including resolving disagreements between management and our independent auditor; (3) providing a medium for consideration of matters relating to any audit issues; and (4) preparing the audit committee report required to be included in our filings under the rules and regulations of the SEC. The written charter for the audit committee is available on our website at http://ir.clovisoncology.com under "Corporate Governance."

* * *

**Nominating and Corporate Governance Committee**

The members of the nominating and corporate governance committee are Drs. Barrett, Blair, and Flaherty and Mr. Atwood, each of whom qualifies as an independent director under the corporate governance standards of the NASDAQ Stock Market. Dr. Barrett serves as chairman of this committee. During fiscal year 2014, our nominating and corporate governance committee met three times.

> The nominating and corporate governance committee assists our board of directors in discharging its responsibilities relating to (1) developing and recommending criteria for selecting new directors, and identifying, screening and recommending nominees for election as directors; (2) screening and recommending to the board of directors individuals qualified to become executive officers; (3) ***evaluating our board of directors and its dealings with management***; (4) ***developing, reviewing and recommending corporate governance guidelines and a code of business ethics***; (5) ***generally advising our board of directors on other corporate governance and related matters***; and (6) ***overseeing non-financial compliance***. The written charter for the nominating and corporate governance committee is available on our website at http://ir.clovisoncology.com under "Corporate Governance."
>
> * * *
>
> **Code of Business Ethics**
>
> We have adopted the Clovis Oncology, Inc. Code of Business Ethics that is reviewed and published annually and contains the ***ethical principles by which our chief executive officer and chief financial officer, among others, are expected to conduct themselves when carrying out their duties and responsibilities***. We intend to satisfy the disclosure requirements under Item 5.05 of Form 8-K regarding amendments to, or waivers from, a provision of our Code of Business Ethics by posting such information on our website at *www.clovisoncology.com*. Our Code of Business Ethics is available on our website at http://ir.clovisoncology.com under "Corporate Governance."

78. Defendants' statements misleadingly suggested that the Board: (i) maintained adequate oversight of the Company's risks and compliance with legal and regulatory requirements; (ii) ensured effective implementation of risk management; (iii) developed proper corporate governance guidelines and a code of business ethics; and (iv) ensured the Company's officers and directors adhered to Clovis' Code, which states that all officers, directors, and employees must "conduct [themselves] in an ethical business manner" and must ensure "[f]ull, fair, accurate, timely and understandable disclosure in the reports required to be filed by the Company with the Securities and Exchange Commission." The 2015 Proxy utterly failed to disclose that: (i) Clovis had significant deficiencies in its drug trial controls; (ii) Clovis was non-

compliant with FDA rules and regulations concerning drug trials and trial data; (iii) the Individual Defendants fostered a culture of lawlessness and unethical behavior at Clovis, and further grossly misrepresented the efficacy and safety data of the Company's most important drug, rociletinib; (iv) the Company's private disclosures to the FDA were substantially different than its public disclosures in various SEC filings; and (v) the Individual Defendants engaged in a highly risky and unethical scheme to artificially inflate the price of Clovis' stock.

79. The 2015 Proxy harmed Clovis by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors. As a result of the Individual Defendants' misleading statements in the 2015 Proxy, Clovis' stockholders voted to re-elect defendants Mahaffy, Barrett, and Spickschen to Clovis' Board.

## THE TRUTH SLOWLY EMERGES AMID A SERIES OF IMPROPER STATEMENTS

80. The truth about rociletinib's actual efficacy began to emerge on November 16, 2015, when the Company issued a press release titled *Clovis Oncology Announces Regulatory Update for Rociletinib NDA Filing*. In the press release, the Company finally admitted for the first time that all of the previously disclosed rociletinib data was "***based primarily on unconfirmed responses***." The press release further admitted that the actual ***confirmed*** response rates was just 28% for patients in the 500mg dose group, and 34% for patients in the 625mg dose group, far less than the Individual Defendants had repeatedly touted. Despite this shocking revelation, defendant Mahaffy assured investors that the Company nonetheless "remain[ed] confident in rociletinib and its potential to treat patients." The press release stated:

> Clovis Oncology, Inc. (NASDAQ: CLVS) today announced that during its regularly scheduled Mid-Cycle Communication Meeting held last week with the U.S. Food and Drug Administration (FDA), the agency requested additional clinical data for use in the efficacy analysis for both the 500mg and 625mg BID

> dose patient groups for rociletinib. The Company will provide this information in a Major Amendment to the FDA by close of business today.
>
> "We remain confident in rociletinib and its potential to treat patients with mutant EGFR T790M-positive lung cancer, said Patrick J. Mahaffy, President and CEO of Clovis Oncology. "We will continue to work diligently with the FDA on our NDA submission."
>
> In the Mid-Cycle Communication meeting, the FDA emphasized that its efficacy analysis would focus solely on confirmed responses. The New Drug Application (NDA) submitted by Clovis to the FDA contained immature data sets based on both unconfirmed response rates and confirmed response rates. These data sets were updated in the 90 day efficacy update the Company submitted at the end of October.
>
> As the rociletinib clinical trials were rapidly enrolling, Clovis presented interim data publicly and at medical meetings and these data therefore included a data set ***based primarily on unconfirmed responses***. This was also true of the Company's Breakthrough Therapy designation submission. In the Company's NDA submission, both immature confirmed and unconfirmed response analyses were submitted. As the efficacy data have matured, the number of patients with an unconfirmed response who converted to a confirmed response was lower than expected.
>
> In the intent to treat analysis of the 79 patients ***in the 500mg dose group, the current confirmed response rate is 28 percent, and 34 percent in the 170 patients in the 625mg dose group***, with an encouraging duration of response in both doses. The most frequent reasons that patients' responses were not confirmed in a subsequent scan were due to progression, often due to brain metastasis, and due to subsequent scans not demonstrating tumor shrinkage greater than 30 percent.
>
> The Company anticipates that the review of this additional information will result in a delay of a potential approval. This additional review could lead to an extension of the Company's March 30, 2016 Prescription Drug User Fee Act (PDUFA) date.

81. Investors, analysts, researchers, and doctors were all universally stunned by the above news. As was later summarized by longtime cancer drug development expert, Dr. Kapil Dhingra:

> [Clovis' rociletinib] ***efficacy data have, consistently and repeatedly, over many years, been misrepresented***…. This is not simply a case of gray zones, ***this is***

> ***black and white untrue presentation of the data***. And it is not just a minor misrepresentation … the true efficacy is about half of what they represented.

82. On November 16, 2015, the same day Clovis disclosed the truth about rociletinib's substantially lower efficacy, the Company's stock price plummeted an astonishing 70%, falling from $99.43 per share to just $30.24, wiping out approximately ***$2.7 billion*** in market capitalization in a single day.

83. In the following months, defendants misleadingly assured investors that despite rociletinib's inferior efficacy to Tagrisso, the drug's purportedly favorable safety profile would keep rociletinib competitive. For example, at the January 13, 2016 annual J.P. Morgan Healthcare conference, defendant Mahaffy touted that rociletinib would "compete just fine" and may "have some advantages" because of its safety profile. Defendant Mahaffy further boasted that the "greater differentiator" between rociletinib and Tagrisso was a choice between purportedly easily-managed hyperglycemia with rociletinib and rash with Tagrisso.

84. On April 8, 2016, the FDA and Clovis publicly released rociletinib's safety data. The data confirmed that, in stark contrast to defendants' repeated statements concerning the drug's safety profile, rociletinib significantly increased the risk of "serious" and "life threatening" adverse cardiovascular events. These increased instances of QT prolongation occurred more than for any other competing therapy, and far more than for Tagrisso. Worse, the data showed that defendants knew this information since at least January 2015. The safety data also showed that, as a result of rociletinib's harmful side effects, 56% of patients interrupted treatment, 51% reduced their dosages, and 12% discontinued therapy altogether. As a result, the FDA insisted that if rociletinib was ever approved for use, it would have to display a "Boxed Warning [on its label] for the risk of QTc prolongation."

85. Following the above news, analysts quickly and accurately determined that rociletinib was "dead." The same day as the above disclosure, Clovis' stock plunged an additional 17.7%, from $19.77 per share to $15.77 per share, wiping out an additional $130.4 million of the Company's market capitalization. The stock continued to drop over the next several days closing at $13.49 per share on April 13, 2016, resulting in a four-day loss of $217.9 million, or nearly a 30% drop.

86. On April 12, 2016, the FDA's Oncologic Drugs Advisory Committee concluded that the available efficacy data and safety data failed to show that rociletinib possessed any clinically meaningful advantage over available therapies and voted twelve to one to delay FDA action on the NDA until the Company could provide concrete evidence that the drug's overall risk/benefit profile merited FDA approval.

87. On May 5, 2016, Clovis issued a press release announcing that the Company had withdrawn its NDA for rociletinib and terminated enrollment in all ongoing sponsored studies of rociletinib.

## DAMAGES TO CLOVIS

88. As a result of the Individual Defendants' improprieties, Clovis disseminated improper, public statements concerning its clinical trials, the true nature of the clinical data, the safety and efficacy of the Company's most important pipeline drug, and the Board's oversight of operations. These improper statements have devastated Clovis' credibility, corporate image, and goodwill, as reflected by the Company's staggering multi-billion dollar market capitalization loss discussed above.

89. Clovis' performance issues also damaged its reputation with the government, the medical field, and in the capital markets. The U.S. government considers a company's ability to comply with applicable laws regulating its industry and not grossly misrepresent clinical data concerning the safety and efficacy of medicines. Similarly, medical doctors and specialists are less likely to consider treatments made by a Company with a known history of misrepresenting clinical data. In addition, Clovis' ability to raise equity capital or debt on favorable terms in the future is now impaired. The Company stands to incur higher marginal costs of capital and debt because the improper statements disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

90. Further, as a direct and proximate result of the Individual Defendants' actions, Clovis has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a) costs incurred in investigating and defending the Company and certain of its officers in the pending Securities Class Action and Direct Action lawsuits; and

(b) costs incurred from compensation and benefits paid to the Individual Defendants.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

91. Plaintiff brings this action derivatively in the right and for the benefit of Clovis to redress injuries suffered, and to be suffered, by Clovis as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof. Clovis is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

92. Plaintiff will adequately and fairly represent the interests of Clovis in enforcing and prosecuting its rights.

93. Plaintiff was a stockholder of Clovis at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Clovis stockholder.

94. The current Board of Clovis consists of the following nine individuals: defendants Mahaffy, Barrett, Atwood, Blair, Klingenstein, McKinley, Spickschen, Flaherty, and Graham. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because a Majority of the Current Board Face a Substantial Likelihood of Liability for Their Misconduct**

95. The principal duty of the Board is to ensure that the Company operates in compliance with all applicable laws and regulations. Defendants Mahaffy, Barrett, Atwood, Blair, Klingenstein, McKinley, Spickschen, Flaherty, and Graham face a substantial likelihood of liability for repeatedly failing to comply with this duty.

96. As alleged above, current Board members—defendants Mahaffy, Barrett, Atwood, Blair, Klingenstein, McKinley, Spickschen, Flaherty, and Graham—violated section 14(a) of the Exchange Act by at least negligently making the misstatements and omissions in the 2015 Proxy. Accordingly, demand is excused because a majority of the Board faces a substantial likelihood of liability.

97. These Director Defendants further breached their fiduciary duties of loyalty by causing or allowing improper statements in the Company's press releases and SEC filings regarding: (i) the clinical data for the Company's core product, rociletinib; (ii) the safety and efficacy of rociletinib; (iii) the marketability of rociletinib; (iv) the Company's compliance with

various rules and regulations; and (v) the Board's oversight of clinical trials and internal controls. These defendants also caused or allowed the Company to report inflated efficacy data to the investing public as compared to the data reported to the FDA. Moreover, rociletinib's true efficacy was far less than what was reported to the FDA and approximately half of what the Individual Defendants publically touted for years. In addition, the drug was significantly less safe than the Individual Defendants repeatedly represented it to be.

98. Any suit by the current directors of Clovis to remedy these wrongs would expose defendants Mahaffy, Mast, Allen, and Ivers-Read, and Clovis to liability for violations of the federal securities laws in the pending consolidated Securities Class Action and defendants Mahaffy, Mast, and Allen in the Direct Action, and would result in civil actions being filed against one or more of the other Individual Defendants. The Securities Class Action alleges violations of sections 10(b) and 20(a) of the Exchange Act, and both the Securities Class Action and Direct Action allege violations of sections 11, 12(a)(2), and 15 of the Securities Act. If the Board elects for the Company to press forward with its right of action against defendants Mahaffy, Mast, Allen, Ivers-Read, and Clovis in this action, then Clovis' efforts would compromise its defense of the Securities Class Action and the Direct Action. Accordingly, demand on the Board is excused.

99. Plaintiff has not made any demand on the other stockholders of Clovis to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a) Clovis is a publicly held company with over 38.3 million shares outstanding and thousands of stockholders;

(b) making demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c) making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

**COUNT I**

**Against Defendants Mahaffy, Barrett, Atwood, Blair, Klingenstein, McKinley, Spickschen, Flaherty, and Graham for Violation of Section 14(a) of the Exchange Act**

100. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

101. The section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. The section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the non-fraud claims.

102. The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2015 Proxy. The 2015 Proxy contained proposals to Clovis' stockholders urging stockholders to re-elect defendants Mahaffy, Barrett, and Spickschen to the Board. The 2015 Proxy, however, misrepresented and failed to disclose: (i) Clovis had significant deficiencies in its drug trial controls; (ii) Clovis was non-compliant with FDA rules and regulations concerning drug trial data and reporting; (iii) the Individual Defendants fostered a culture of lawlessness and

unethical behavior at Clovis, and further grossly misrepresented the efficacy and safety data of the Company's most important drug, rociletinib; (iv) the Company's private disclosures to the FDA were substantially different than its public disclosures in various SEC filings; and (v) the Individual Defendants engaged in a highly risky and unethical scheme to artificially inflate the price of Clovis' stock. By reasons of the conduct alleged herein, the Director Defendants violated section 14(a) of the Exchange Act. As a direct and proximate result of these Director Defendants' wrongful conduct, Clovis misled and/or deceived its stockholders by making misleading statements that were an essential link in stockholders heeding Clovis' recommendation to re-elect defendants Mahaffy, Barrett, and Spickschen to the Board.

103. The misleading information contained in the 2015 Proxy was material to Clovis' stockholders in determining whether or not to elect the Director Defendants. This information was also material to the integrity of the directors that were proposed for election to the Board. The proxy solicitation process in connection with the 2015 Proxy was an essential link in the re-election of nominees to the Board.

104. Plaintiff, on behalf of Clovis, thereby seeks relief for damages inflicted upon the Company based upon the misleading 2015 Proxy in connection with the improper re-election of the members of the Board.

**COUNT II**

**Against the Individual Defendants for Breach of Fiduciary Duty**

105. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

106. The Individual Defendants owed and owe Clovis fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Clovis the highest obligation of good faith, fair dealing, loyalty, and due care.

107. The Individual Defendants violated and breached their fiduciary duties of candor, good faith, and loyalty. More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within Clovis, and/or consciously failing to prevent to Company from engaging in the unlawful acts complained of herein.

108. The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration. The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) for years, Clovis had significant deficiencies in its drug trial controls; (ii) for years, Clovis was non-compliant with FDA rules and regulations concerning drug trial data and reporting; (iii) for years, the Individual Defendants grossly misrepresented the efficacy and safety data of the Company's most important drug, rociletinib; (iv) the Company's private disclosures to the FDA were substantially different than the Individual Defendants' public disclosures in various SEC filings; (v) the Individual Defendants engaged in a highly risky and unethical scheme to artificially inflate the price of Clovis' stock; and (iv) the Individual Defendants' public statements about Clovis' business, including with respect to the Offering, were misleading. Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

109. The Director Defendants, as directors of the Company, owed Clovis the highest duty of loyalty. These defendants breached their duty of loyalty by recklessly permitting the improper activity detailed herein. The Director Defendants knew or were reckless in not

knowing that: (i) for years, Clovis had significant deficiencies in its drug trial controls; (ii) for years, Clovis was non-compliant with FDA rules and regulations concerning drug trial data and reporting; (iii) for years, the Individual Defendants grossly misrepresented the efficacy and safety data of the Company's most important drug, rociletinib; (iv) the Company's private disclosures to the FDA were substantially different than the Individual Defendants' public disclosures in various SEC filings; (v) the Individual Defendants engaged in a highly risky and unethical scheme to artificially inflate the price of Clovis' stock; and (iv) the Individual Defendants' public statements about Clovis' business, including with respect to the Offering, were misleading. Accordingly, the Director Defendants breached their duty of loyalty to the Company.

110. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Clovis has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

111. Plaintiff, on behalf of Clovis, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Waste of Corporate Assets

112. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

113. As a result of the wrongdoing alleged herein and by failing to conduct proper supervision, the Individual Defendants have caused Clovis to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors who breached their fiduciary duty.

114. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

115. Plaintiff, on behalf of Clovis, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

116. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

117. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Clovis. The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Clovis.

118. Plaintiff, as a stockholder and representative of Clovis, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

119. Plaintiff, on behalf of Clovis, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Clovis, demands judgment as follows:

A. Against all of the defendants and in favor of the Company for the amount of any and all damages sustained by the Company as a result of the defendants' violations of securities law, breaches of fiduciary duties, waste of corporate assets, and unjust enrichment, including any and all damages compensable under the wrong of another doctrine;

B. Directing Clovis to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Clovis and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following Corporate Governance Policies:

1. a proposal to strengthen the Company's drug trial controls;

2. a proposal to strengthen the Company's operational controls;

3. a proposal to strengthen the Company' disclosure controls to ensure material information is adequately and timely disclosed to the SEC and public;

4. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

5. a provision to permit the stockholders of Clovis to nominate at least three candidates for election to the Board;

C. Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Clovis has an effective remedy;

D. Awarding to Clovis restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E. Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: March 20, 2017

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
GEORGE C. AGUILAR
STEVEN M. MCKANY

/s/*Brian J. Robbins*
BRIAN J. ROBBINS

600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsarroyo.com
gaguilar@robbinsarroyo.com
smckany@robbinsarroyo.com

Attorneys for Plaintiff

1157771

VERIFICATION

I, Wenduo Guo, hereby declare as follows:

I am the plaintiff in the within entitled action. I have read the Verified Stockholder Derivative Complaint. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 3/13/17

WENDUO GUO