IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 17-cv-00706-RBJ

WENDUO GUO, derivatively on behalf of Clovis Oncology Inc.,

      Plaintiff,

v.

PATRICK J. MAHAFFY,
DANIEL W. MUEHL,
GILLIAN C. IVERS-READ,
M. JAMES BARRETT,
BRIAN G. ATWOOD,
JAMES C. BLAIR,
PAUL H. KLINGENSTEIN,
EDWARD J. MCKINLEY,
THORLEF SPICKSCHEN,
KEITH FLAHERTY,
GINGER L. GRAHAM,
ERLE T. MAST, and
ANDREW R. ALLEN,

      Defendants,

and

CLOVIS ONCOLOGY, INC., a Delaware corporation,

      Nominal Defendant.

---

## ORDER ON DEFENDANT'S MOTION TO DISMISS

---

This matter is before the Court on defendants' motion to dismiss.  ECF No. 40.  For

the reasons discussed below, the motion is GRANTED.

1

# I. FACTS

Nominal Defendant Clovis Oncology, Inc. ("Clovis") is a biopharmaceutical company. ECF No. 35 at ¶2.  Clovis acquires, develops, and commercializes anti-cancer products across the United States, Europe, and other international markets.  *Id.*  Individual defendants Patrick J. Mahaffy, Daniel H. Muehl, Gillian C. Ivers-Read, M. James Barrett, Brian G. Atwood, James C. Blair, Paul H. Klingenstein, Edward J. McKinley, Thorleff Spickschen, Keith Flaherty, Ginger L. Graham, Erle T. Mast, and Andrew R. Allen (collectively "individual defendants") are current and former officers and directors of Clovis.  *Id.* at ¶1.  Plaintiff Wenduo Guo is a stockholder of Clovis.  *Id.* at ¶19.  He was also a stockholder at the time of the alleged wrongdoing in this case and has maintained his stockholder status continuously since that time.  *Id.*

During the period relevant to this case, Clovis had no marketed products but did have three oncology products under development.  *Id.* at ¶3, 47.  One of them, rociletinib, is the focus of this litigation.  *Id.* at ¶3.  Rociletinib was intended for the treatment of lung cancer patients resistant to front-line therapies.  *Id.*  These patients represented an estimated $3 billion untapped market.  *Id.* at ¶48.  Beginning in or about 2013, Clovis began a series of clinical tests to attempt to receive FDA approval for a new drug application ("NDA") for rociletinib.  *Id.* at ¶4.  These tests included "TIGER-X", a multi-year safety and efficacy trial, and "TIGER-2", an additional efficacy trial.  Both trials were "open label" which meant the trial data was available to defendants throughout the time of the studies.  *Id.* at ¶50.

Plaintiff alleges that, according to defendant Clovis, the "primary endpoint" of these trials was to determine the "objective response rate" ("ORR") of rociletinib under "Response Evaluation Criteria in Solid Tumors" ("RECIST") standards.  *Id.* at ¶4.  ORR represents the

percentage of patients in the trials who experience clinically meaningful tumor shrinkage when being treated with the drug. RECIST standards require that each tumor shrinkage instance be "confirmed" in an additional scan occurring weeks after the first scan. *Id.* This requirement aims to avoid overestimating response rates. As plaintiff explains, the tumor shrinkage rate cannot be included in the ORR calculation unless it is confirmed through this second scan. *Id.*

In late 2013 pharmaceutical company AstraZeneca disclosed that it was developing a new cancer treatment drug, called Tagrisso. *Id.* at ¶49. Tagrisso was targeted at the same $3 billion market of treatment-resistant cancer patients. Clovis was thus racing AstraZeneca to develop rociletinib and bring it to market first. *Id.*

In mid-2014 AstraZeneca reported a confirmed ORR for Tagrisso of 54%. *Id.* at ¶55. A few weeks later, on May 31, 2014, Clovis reported at the 2014 American Society of Clinical Oncology medical conference that rociletinib exhibited a "58% objective response rate" in its Phase II TIGER-X trial. Clovis also reported that the ORR was evaluated "per RECIST v1.1" standards. *Id.* That same day Clovis issued a press release, also filed with the Securities and Exchange Commission ("SEC"), which repeated the 58% ORR number. *Id.* at ¶56. The press release included a statement that Clovis was "extremely pleased with the consistency of the efficacy demonstrated to date, the growing evidence of a lengthy duration of benefit and that [rociletinib] is so well-tolerated with a manageable side effect profile." *Id.* This number misrepresented the true ORR of rociletinib because it was not confirmed, as required under RECIST standards.

Nonetheless Clovis' representatives continued to tout this 58% number and other unconfirmed ORR rates. *Id.* at ¶¶58–62. According to plaintiff, individual defendants continued

to misrepresent the efficacy and safety of rociletinib during and after these trials over a period of years. Through a series of press releases, conference and symposium presentations, investor calls, investor conferences, and a publication in the *New England Journal of Medicine,* defendants misrepresented the following: that rociletinib trials strictly adhered to RECIST standards; that rociletinib was performing "extremely well" in trials; that rociletinib had an "impressive" and "highly compelling" efficacy profile; that rociletinib had a strong safety profile including minimal and "easily managed" side effects; that rociletinib was "well tolerated;" and that rociletinib would "compete very effectively" with a similar drug called Tagrisso being developed by AstraZeneca. *Id.* at ¶¶5, 56–74.

Clovis held its 2015 Annual Meeting of Stockholders on June 11, 2015. *Id.* at ¶14. On April 30, 2015 Clovis filed a proxy statement on Schedule DEF 14A with the Securities and Exchange Commission ("SEC"). This was done upon the directive of individual defendants Mahaffy, Atwood, Barrett, Blair, Flaherty, Graham, Klingenstein, McKinley, and Spickschen. *Id.* At the time, Mahaffy, Barrett, and Spickschen were members of Clovis' board of directors.

The proxy statement elicited stockholder votes in part to approve their reelection to the board. *Id.* The proxy statement contained language on the board's role in risk management and oversight; the audit committee, whose responsibilities included overseeing compliance with legal and regulatory requirements; the corporate governance committee; and the company's adoption of a Code of Business Ethics. *Id.* at ¶80.

According to the information defendants provided in the proxy statement and more broadly, things with rociletinib were going well. But on November 16, 2015 Clovis issued a press released titled *Clovis Oncology Announces Regulatory Update for Rociletinib NDA Filing,*

4

which announced that the 60% ORR it had originally reported was actually "based primarily on unconfirmed responses." *Id.* at ¶6, 83. The confirmed response ORR was instead only 28% for patients receiving 500mg doses and 34% for patients receiving 625mg doses. *Id.* at ¶83. Plaintiff alleges that, as a result of this announcement, Clovis' stock price decreased nearly 70% from the previous trading day's closing price of $99.43 to the announcement day's closing price of $30.24. *Id.* at ¶7. This represented a loss of $2.6 billion in market capitalization in one day. *Id.* Nonetheless, after this announcement the individual defendants assured investors that rociletinib had a favorable safety profile and could still be a commercial success. *Id.* at ¶8, 86.

However, rociletinib's situation got worse, not better. On April 8, 2016 the Food & Drug Administration ("FDA") publicly disclosed that rociletinib significantly increased the risk of "serious" and "life threatening" cardiovascular events in patients taking the drug. *Id.* at ¶9, 87. Among the patients taking rociletinib, 56% interrupted treatment, 51% reduced their doses, and 12% discontinued treatment due to the drug's adverse side effects. *Id.* at ¶87. The FDA announcement also stated that rociletinib would need to display the strongest safety warning if ever approved for commercial use. *Id.* at ¶9. That same day, Clovis' stock price decreased an additional 17.7%, resulting in a loss of $130.4 million in market capitalization. *Id.* at ¶10.

On April 12, 2016 the FDA's Oncologic Drugs Advisory Committee voted to delay FDA action on rociletinib's new drug application until Clovis could provide evidence that the drug's risk-benefit profile warranted approval. *Id.* at ¶89. On May 5, 2016 Clovis announced that it was withdrawing rociletinib's new drug application from the FDA and terminating enrollment in all ongoing sponsored clinical trials of the drug. *Id.* at ¶90.

Rociletinib's failure prompted a slew of litigation.  A Securities Class Action was filed in this court on November 19, 2015.  *See* 15-cv-02546-RM-MEH ECF No. 1.  That lawsuit was filed on behalf of investors who purchased Clovis shares between May 31, 2014 and April 7, 2016 and who purchased shares in connection with a secondary offering held by Clovis on July 14, 2015.  ECF No. 35 at ¶11.  The Securities Class Action was settled for $142 million.  The settlement was approved by this court on October 26, 2017.  *Id.*; *see also* 15-cv-02546-RM-MEH ECF No. 176.

The SEC brought charges against Clovis and certain individual defendants for misleading investors about rociletinib.  *Id.* at ¶12.  The SEC's complaint and settlement agreement established that Clovis' board and senior management knew that the drug's true ORR was unconfirmed and was substantially lower than the ORR reported to the public and stockholders.  *Id.*  The case settled on September 18, 2018.  Clovis agreed to pay a $20 million civil penalty.  Defendants Mahaffy and Mast respectively agreed to pay $250,000 and $554,145 in fines and penalties.  *Id.*

A stockholder derivative action was also filed in the Delaware Court of Chancery on March 23, 2017.  *In re Clovis Oncology, Inc. Derivative Litig.*, No. CV 2017-0222-JRS, 2019 WL 4850188, at *9 (Del. Ch. Oct. 1, 2019).  Many individual defendants here are also named defendants in that case.  Defendants filed a motion to dismiss which the Court of Chancery granted in part and denied in part on October 19, 2019.  *Id.* at *18.  On May 13, 2020 the court stayed the proceedings until September 18, 2020 to permit Clovis' Special Litigation Committee to undertake an investigation.  *In re Clovis Oncology, Inc.*, No. 2017-0222-JRS, 2020 WL 2495981, at *1 (Del.Ch. May 13, 2020).  The action is still pending.

## II. PROCEDURAL BACKGROUND

Plaintiff filed their initial complaint in this derivative stockholder action on March 20, 2017.  ECF No. 1.  Plaintiff filed a second amended complaint on February 7, 2020.  ECF No. 35.  The complaint alleges that defendants violated Section 14(a) of the Securities Act and breached their fiduciary duties.  *Id.* at ¶¶105–16.  On February 28, 2020 defendants filed a motion to dismiss the second amended complaint on the grounds that it failed to state a claim under FED. R. CIV. P. 12(b)(6), and that plaintiff was obligated to bring his breach of fiduciary duty claim in the Delaware Court of Chancery.  ECF No. 40.  On March 20, 2020 plaintiff filed a response opposing the motion.  ECF. No. 41.  Defendants submitted a reply shortly after on April 3, 2020.  ECF No. 44.

## III. STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion to dismiss, the complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A plausible claim is a claim that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  While the Court must accept the well-pled allegations of the complaint as true and construe them in the light most favorable to the plaintiff, *Robbins v. Wilkie*, 300 F.3d 1208, 1210 (10th Cir. 2002), conclusory allegations are not entitled to be presumed true.  *Iqbal*, 556 U.S. at 681.  However, so long as the plaintiff offers sufficient factual allegations such that the right to relief is raised above the speculative level, he has met the threshold pleading standard.  *See, e.g.*, *Twombly*, 550 U.S. at 556; *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008).

# IV. ANALYSIS

## A. <u>Plaintiff's Section 14(a) claim</u>

Plaintiff alleges that defendants violated Section 14(a) of the Securities and Exchange

Act.  ECF No. 35 at ¶¶105–09.  Section 14(a) makes it "unlawful for any person . . . to solicit or

to permit the use of his name to solicit any proxy" in contravention of SEC rules and regulations.

15 U.S.C. § 78n(a).  SEC Rule 14a-9(a) reads

> No solicitation subject to this regulation shall be made by means of any proxy statement,
> form of proxy, notice of meeting or other communication, written or oral, containing any
> statement which . . . is false or misleading with respect to any material fact, or which
> omits to state any material fact necessary in order to make the statements therein not false
> or misleading . . . .

17 C.F.R. § 240.14a-9.  There are thus two ways a proxy statement can be false or misleading.

The first is by *affirmatively making* a false or misleading statement of material fact.  The second

is by *omitting* a material fact necessary to make the proxy statement, or part of the proxy

statement, not false or misleading.

To prevail on an SEC Rule 14a claim, a plaintiff must prove that "(1) there was a material

misrepresentation of fact made by the defendant in a proxy statement governed by the Act; (2)

the misrepresentation caused injury to the plaintiff; and (3) the proxy solicitation was an essential

link in the accomplishment of the transaction."  *City P'ship Co. v. Lehman Bros.*, 344 F. Supp.

2d 1241, 1246 (D. Colo. 2004) (citing *Mills v. Elec. Auto–Lite Co.*, 396 U.S. 375, 384–85

(1970)).  The Rule provides examples of what statements or omissions could count as

misleading.  17 C.F.R. § 240.14a-9.  These include predictions of specific market values;

impugnation of character, integrity, or personal reputation, or allegations of improper, illegal or

immoral conduct or associations without factual foundation; failure to distinguish between the

proxy statement and the soliciting materials of other persons; claims made prior to a meeting

regarding solicitation results; failure to disclose material information about proxy voting advice

such as the business's methodology, information sources, or conflicts of interest. *Id.*

>Plaintiff alleges the 2015 proxy statement misrepresented or failed to disclose that
>
>(i) Clovis had significant deficiencies in its drug trial controls with a drug that was the most important and prominent of the three drugs in the Company's drug trial pipeline and critical to its business operation;
>(ii) Clovis was noncompliant with FDA rules and regulations concerning drug trials and trial data;
>(iii) the Individual Defendants fostered a culture of lawlessness and unethical behavior at Clovis, and further grossly misrepresented, including by knowingly and consciously submitting incomplete and incorrect data to the FDA, the efficacy and safety data of the Company's most important drug, rociletinib;
>(iv) the Company's private disclosures to the FDA were substantially different than its public disclosures in various SEC filings; and
>(v) the Individual Defendants engaged in a highly risky and unethical scheme to artificially inflate the price of Clovis' stock.

ECF No. 35 at ¶107.

>Defendants make three arguments against plaintiff's Section 14(a) claim in their motion

to dismiss. First, they argue that plaintiff's complaint improperly bootstraps a state-law breach

of fiduciary duty claim onto a Section 14(a) claim. ECF No. 40 at 10. Second, they argue that

the complaint fails to allege any false or misleading statements in the proxy statement. *Id.* at 15–

16. Third, defendants argue that even if the complaint sufficiently alleges a false or misleading

statement, it fails to allege "transaction causation." *Id.* at 17–18. I address each of these

arguments in turn.

1. Whether plaintiff's complaint improperly "bootstraps" a state-law breach of fiduciary claim onto its Section 14(a) claim

Defendants first argue that plaintiff's Section 14(a) claim is "predicated on an affirmative duty to disclose wrongdoing" and is thus "expressly foreclosed" by the Supreme Court's ruling in *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462 (1977) and its progeny.  ECF No. 40 at 11–15.  In *Santa Fe* the Supreme Court addressed the reach and coverage of Section 10(b) of the Securities and Exchange Act, not Section 14(a).  It held that Rule 10b-5 did not reach state law claims of breach of fiduciary duty unless the conduct alleged can be fairly viewed as "manipulative or deceptive" within the meaning of the statute.  *Santa Fe*, 430 U.S. at 474.  The court stated that "[a]bsent a clear indication of congressional intent, we are reluctant to federalize the substantial portion of the law of corporations that deals with transactions in securities."  *Id.* at 479.  Transactions constituting "no more than internal corporate mismanagement" do not fall under the ambit of Section 10(b).  *Id.*

Defendants assert that *Santa Fe*'s progeny of cases preclude similar "bootstrapping" of state law fiduciary breach claims onto Section 14(a) claims.  ECF No. 40 at 10.  Plaintiff argues that these cases do not preclude his claim but instead are distinguishable or support his theory.  ECF No. 41 at 16.  I agree with defendants.

The Tenth Circuit has not addressed the issue of whether a Section 14(a) claim can be based solely on a state law fiduciary breach claim, or whether this instead constitutes improper "bootstrapping."  Other circuits have, however.  The thrust of these cases is that mere breaches of fiduciary duty, absent self-dealing or something similar, cannot form the basis for a Section

14(a) claim.  The Second Circuit, for example, has noted "[a]llegations that a defendant failed to disclose facts material only to support an action for breach of state-law fiduciary duties ordinarily do not state a claim under the federal securities laws."  *Field v. Trump*, 850 F.2d 938, 948 (2d Cir. 1988).  In a different decision, the Second Circuit distinguished the case before it from other "bootstrapping" cases by writing

> This claim does not present merely another attempt to use s 14(a) and Rule 14a-9 as an avenue for access to the federal courts in order to redress alleged mismanagement or breach of fiduciary duty on the part of corporate executives. Efforts to dress up claims of the latter type in a s 14(a) suit of clothes have consistently been rejected . . . .

*Maldonado v. Flynn*, 597 F.2d 789, 796 (2d Cir. 1979).  In *Gaines v. Haughton* the Ninth Circuit came to a similar conclusion:

> We draw a sharp distinction, however, between allegations of director misconduct involving breach of trust or self-dealing the nondisclosure of which is presumptively material and allegations of simple breach of fiduciary duty/waste of corporate assets the nondisclosure of which is never material for s 14(a) purposes. . . . Absent credible allegations of self-dealing by the directors or dishonesty or deceit which inures to the direct, personal benefit of the directors a fact that demonstrates a betrayal of trust to the corporation and shareholders and the director's essential unfitness for corporate stewardship we hold that director misconduct of the type traditionally regulated by state corporate law need not be disclosed in proxy solicitations for director elections. This type of mismanagement, unadorned by self-dealing, is simply not material or otherwise within the ambit of the federal securities laws.

645 F.2d 761, 776–79 (9th Cir. 1981), *overruled on other grounds by In re McLinn*, 739 F.2d 1395 (9th Cir. 1984).  In discussing both Section 10(b) and Section 14(a), the Eighth Circuit wrote "it was not the purpose of the federal security laws to provide a federal cause of action for stockholders who have been damaged by mere corporate mismanagement or breach of fiduciary duty by those in charge of the affairs of the corporation."  *Golub v. PPD Corp.*, 576 F.2d 759, 764 (8th Cir. 1978).

The D.C. Circuit's analysis of materiality in federal securities law is particularly illuminating.  Like its sister circuits, the court concludes that "a plaintiff may not 'bootstrap' a claim of breach of fiduciary duty into a federal securities claim by alleging that directors failed to disclose that breach of fiduciary duty."  *Kas v. Fin. Gen. Bankshares, Inc.*, 796 F.2d 508, 513 (D.C. Cir. 1986) (citing *Panter v. Marshall Field & Co.*, 646 F.2d 271, 288 (7th Cir.), *cert. denied*, 454 U.S. 1092 (1981)).  The court further explains

> This is true even though knowledge that an officer or director had actually breached his fiduciary duty might well satisfy the materiality requirement that the omitted or misstated fact be likely to "have assumed actual significance in the deliberations of the reasonable shareholder." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). . . . [L]iability under the federal securities laws should not turn on the resolution of essentially state-law issues. Thus, if the validity of a shareholder's claim of material misstatement or nondisclosure rests solely on a legal determination that the transaction was unfair to a minority shareholder or that an officer or director's conduct amounted to a breach of his fiduciary duty, the claim does not state a cause of action under sections 10(b) or 14(a) of the Securities Exchange Act. . . . On the other hand, *Santa Fe* certainly does not preclude liability under sections 10(b) and 14(a) where a proxy statement fails to disclose either that a member of management has a personal stake in the corporate decision being made or that some special relationship exists between a member of management and some other party with interests adverse to the shareholders. Facts of this nature have always been considered material, and a failure to disclose such facts states a claim under the federal securities laws.

*Id.  See also Isquith by Isquith v. Caremark Int'l, Inc.*, 136 F.3d 531, 534 (7th Cir. 1998) (refusing to follow precedent that "would allow every complaint about the mismanagement of a corporation that issues securities subject to federal securities law to be shoehorned into federal court on the theory that management had defrauded the shareholders by concealing the mismanagement."); *Pavlidis v. New England Patriots Football Club, Inc.*, 737 F.2d 1227, 1236 (1st Cir. 1984) (noting that "[a] breach of fiduciary duty involving self-dealing by a corporate officer would plainly be material to a proxy statement soliciting votes for the re-election of that officer").

Although the District of Colorado has not addressed whether bootstrapping state law claims to Section 14(a) claims is permissible, we have addressed that question regarding Section 10(b) claims.  The court's reasoning in the Section 10(b) context is helpful to this Court's analysis here.  In *Andropolis v. Red Robin Gourmet Burgers, Inc.*, the court pointed to "the now clearly established rule that a plaintiff may not 'bootstrap' a claim for internal corporate mismanagement or breach of fiduciary duty by alleging that the corporation or its directors failed to disclose that mismanagement or breach."  505 F. Supp. 2d 662, 682 (D. Colo. 2007) (citations omitted).

I follow the logic of our holding in *Andropolis* as well as the conclusions of sister circuits regarding 14(a) claims.  Section 14(a) does not extend to state law breach of fiduciary duty claims absent allegations of self-dealing.  The remaining question, then, is whether plaintiff pleads only a run-of-the-mill fiduciary breach claim or if he also alleges self-dealing sufficient to bring the claim under Section 14(a).  I conclude that plaintiff pleads only the former.

Examples of self-dealing include an officer or director having a personal stake in a corporate transaction or having a special relationship with a party whose interests are adverse to the company's.  *See e.g. Kas*, 796 F.2d at 513.  Nowhere in his complaint does plaintiff use the term "self-dealing" or allege anything like a typical self-dealing scenario.  *See generally* ECF No. 35.  Plaintiff's only nod towards self-dealing is that defendants were reelected to the Board, secured their prestigious positions, and retained their "undeserved director compensation."  ECF No. 35 at ¶79; ECF No. 41 at 17.  This is insufficient.  If attempting to keep one's position and compensation as a corporate officer constituted self-dealing then the term could encompass virtually everything an officer did—even if the officer's action benefited only the company and

were to his own detriment.  Plaintiff cites no legal authority suggesting Board reelection and compensation alone can comprise self-dealing.

Instead plaintiff merely alleges failures to disclose breaches of fiduciary duty.  Stripping away its conclusory statements, the complaint alleges that defendants did not follow FDA rules or regulations and failed to disclose (at least initially) to investors or the public that rociletinib's ORRs were unconfirmed.  Though these choices or omissions may have caused Clovis' stock prices to remain artificially inflated, they do not constitute self-dealing by any of its officers or directors.  There is simply no allegation by plaintiff that any officer or director received extra compensation, or garnered personal business opportunities, or engaged in deceitful behavior to his or her personal benefit during the course of these events.  Plaintiff's complaint alleges mismanagement and breach of fiduciary duties, but not more.  It is also telling that, in the parallel derivative shareholder suit in Delaware based on the same facts, only the fiduciary breach claim survived a motion to dismiss.  The Delaware Court of Chancery found the complaint before it insufficient to sustain neither the unjust enrichment nor the unlawful stock trades claim.  *In re Clovis Oncology, Inc. Derivative Litig.*, 2019 WL 4850188, at *1.

Plaintiff's arguments to the contrary are unconvincing.  He attempts to distinguish *Gaines* on the grounds of a "carve-out" for plausible Section 14(a) claims based on "credible allegations of . . . dishonesty or deceit which inures to the direct, personal benefit of the directors a fact that demonstrates a betrayal of trust to the corporation and shareholders and the director's essential unfitness for corporate stewardship . . ."  *Gaines*, 645 F.2d at 779; ECF No. 41 at 17.  But even if plaintiff *had* pled dishonesty or deceit by Clovis' officers and directors (which this Court is not convinced plaintiff has), he has not pled it directly, personally benefited them.  I read this "carve-

14

out" as simply another phrase for self-dealing, which plaintiff has not pled. Plaintiff next contends that defendants' reliance on *Andropolis*, *Field*, and other *Sante Fe* progeny is inappropriate because those cases "do not involve allegations of director and management deceptions and misrepresentations." ECF No. 41 at 17. As defendants point out, plaintiff mischaracterizes these cases. Both *Andropolis* and *Field* involved allegations of nondisclosure. *Andropolis*, 505 F. Supp. 2d at 666; *Field*, 850 F.2d at 946.

Plaintiff relies heavily on *Wells Fargo* and *Countrywide*, district court decisions from other jurisdictions. The former involved a Section 14(a) claim that was actionable because the complaint alleged "Defendants knew of, but failed to disclose, a fraudulent business practice that put the company at material risk." *In re Wells Fargo & Co. S'holder Derivative Litig.*, 282 F. Supp. 3d 1074, 1103 (N.D. Cal. 2017). The latter involved "proxy statements fail[ing] to disclose that Countrywide abandoned its underwriting standards, thus exposing itself to an undisclosed level of heightened risk." *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1076–77 (C.D. Cal. 2008).

Neither of these cases is binding on this Court. Furthermore, unlike in *Wells Fargo* plaintiff here disclaims any allegation of fraudulent business practices. ECF No. 35 at ¶79 ("Plaintiff's allegations . . . do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness . . ."). *Countrywide* is also inapposite because plaintiff here does not allege that defendants abandoned Clovis' underwriting standards or similar policies, just that its proxy statement did not disclose the unconfirmed nature of the ORRs. Nor did Clovis' 2015 proxy statement "tout extraordinary financial results" as the statement in *Countrywide* did.

Plaintiff's attempt to dress up a breach of fiduciary duty as a Section 14(a) claim is unsuccessful.  The complaint does not allege self-dealing by Clovis' officers or directors. Therefore, plaintiff fails to state a cognizable claim under 15 U.S.C. § 78n(a) and 17 C.F.R. § 240.14a-9.

2. <u>Whether plaintiff alleges false or misleading statements in Clovis' proxy statement</u>

I find it prudent to assess plaintiff's claim on the merits given the uncertain nature of Tenth Circuit law on Section 14(a) bootstrapping.  Even if plaintiff had alleged facts that support a Section 14(a) claim, plaintiff's case still fails under Rule 12(b)(6) for failure to allege a misrepresentation in Clovis' proxy statement.

a. <u>Affirmative statements of material fact that are false or misleading</u>

A proxy statement affirmatively misrepresents when it "contain[s] any statement which . . . is false or misleading with respect to any material fact."  17 C.F.R. § 240.14a-9.  Plaintiff alleges the 2015 proxy statement "misleadingly suggested" that Clovis' board "(i) maintained adequate oversight of the Company's risks and compliance with legal and regulatory requirements; (ii) ensured effective implementation of risk management; (iii) developed proper corporate governance guidelines and a code of business ethics; and (iv) ensured the Company's officers and directors adhered to Clovis' Code."  ECF No. 35 at ¶81.  Plaintiff recites the proxy language over the course of two pages in the complaint.  *Id.* at 80 (pp. 40–41).  In his response to defendants' motion, plaintiff narrows the proxy statement language he challenges to:

> [1] ***The audit committee and the full board of directors focus on the most significant risks we face and our general risk management strategies. While our board of directors oversees our risk management***, company management is responsible for day-to-day risk management processes. ***Our board of directors expects company management to consider risk and risk management in each business decision, to proactively develop and monitor risk management strategies and processes for day-to-day activities and to***

*effectively implement risk management strategies adopted by the audit committee and the board of directors.*

[2] Our audit committee oversees a broad range of issues surrounding our accounting and financial reporting processes and audits of our financial statements, and assists our board of directors by: (1) overseeing and monitoring the quality and integrity of our financial statements, *our compliance with legal and regulatory requirements and our internal accounting procedures and systems of internal controls . . . .*

[3] The nominating and corporate governance committee assists our board of directors in discharging its responsibilities relating to (1) developing and recommending criteria for selecting new directors, and identifying, screening and recommending nominees for election as directors; (2) screening and recommending to the board of directors individuals qualified to become executive officers; (3) *evaluating our board of directors and its dealings with management*; (4) *developing, reviewing  and recommending corporate governance guidelines and a code of business ethics*; (5) *generally advising our board of directors on other corporate governance and related matters*; and (6) *overseeing non-financial compliance*.

[4] We have adopted the Clovis Oncology, Inc. Code of Business Ethics that is reviewed and published annually and contains *the ethical principles by which our Chief executive officer and chief financial officer, among others, are expected to conduct themselves when carrying out their duties and responsibilities.*

ECF No. 41 at 13–14 (emphasis in original).

Plaintiff claims the preceding four paragraphs constitute "affirmative statements of compliance with law, regulations, and Company governance rules" that are false or misleading. *Id.* at 13.  Plaintiff also asserts that the statements "sought to assure stockholders that corporate governance structures were in place that would justify their investments and capture and halt any deceptive scheme that would materially harm their equity in the Company."  *Id.* at 14.  Plaintiff contends these "affirmative representations about Board governance would prevent any scheme involving deceptive business practices from occurring."  *Id.*  Later plaintiff paraphrases these statements as "the Board and management adopted effective risk management strategies, were in

compliance with legal and regulatory requirements, and developed and adopted a code of business ethics and ethical principles." *Id.* at 16.

I do not read these statements as plaintiff reads them.  Even if plaintiff were correct that stockholders could properly infer plaintiff's interpretations from the proxy language, this is irrelevant.  Section 14(a) asks whether there is a false or misleading *statement*—not inference or interpretation—in the proxy statement.  This determination requires analyzing the proxy statement's explicit language, not what might be inferred from it.  Plaintiff has alleged nothing that suggests any of these explicit statements above are false or misleading.

Plaintiff does not claim, for example, that the audit committee and board do *not* focus on the company's most significant risks or that the board failed to oversee risk management, in contrast to statement [1] above.  Similarly, plaintiff does not allege that the audit committee *failed* to oversee or monitor Clovis' compliance with legal and regulatory processes, internal accounting procedures, or systems of internal controls (see statement [2] above).  Plaintiff instead takes issue with the *adequacy* of the board and audit committee's oversight, of which the proxy statement itself says nothing.  ECF No. 35 at ¶81.  Similarly, nothing in the complaint suggests the nominating and corporate governance committee stopped assisting the board with its evaluation, corporate governance guidelines, or non-financial compliance, or that it never provided this assistance to begin with, as would conflict with statement [3].  Instead plaintiff argues about whether the governance guidelines and code of ethics were "proper" and would prevent the type of "deceptive scheme" defendants purportedly undertook.  *Id.*; ECF No. 41 at 13–14.  Finally, the complaint nowhere alleges that defendants did not adopt a Code of Business Ethics as the proxy language says in statement [4] above.  Defendants argue, and plaintiff does

not contest, that they in fact *did* adopt this Code.  ECF No. 44 at 7; *see generally* ECF Nos. 35,

41.  Plaintiff's dispute is that the board supposedly "ensured" Clovis "adhered" to the Code when

according to plaintiff it did no such thing.  But again, plaintiff reads language into the proxy

statement that simply is not there.  I therefore conclude the complaint alleges nothing to support

plaintiff's claim that Clovis' 2015 proxy statement contained affirmative statements of material

fact that were false or misleading.

      b. <u>Omissions of material fact that make the proxy statement false or misleading</u>

A proxy statement misrepresents by omission if it "omits to state any material fact

necessary *in order to make the statements therein* not false or misleading . . . ."  17 C.F.R. §

240.14a-9 (emphasis added).  Thus, it is not sufficient for plaintiff to allege that a proxy

statement omitted, or failed to disclose, a material fact.  In order to state a claim under 14(a) the

omission must also render the entire proxy statement, or a statement within it, false or

misleading.  In other words, nondisclosure on its own—even of a material fact—is not enough.

Only if the failure to disclose makes an affirmative statement in the proxy untrue or misleading

can plaintiff allege a Section 14(a) claim via omission.

Here, plaintiff alleges that defendants failed to disclose the following five material facts

in the 2015 proxy statement: (i) there were "significant deficiencies" in rociletinib's drug trial

controls; (ii) Clovis did not comply with FDA drug trial and trial data rules and regulations; (iii)

individual defendants "fostered a culture of lawlessness and unethical behavior" and

misrepresented rociletinib's efficacy and safety data; (iv) Clovis' private disclosures to the FDA

different significantly from its public disclosures in SEC filings; and (v) individual defendants

engaged in a "highly risky and unethical scheme" to artificially inflate Clovis' stock price.  ECF No. 35 at ¶81; ECF No. 41 at 16.

It is undisputed that none of these "facts" are disclosed in the 2015 proxy statement.  *See* ECF No. 35 at ¶81.  But even assuming these allegations constitute "material facts," plaintiff points to no statement in the proxy that is rendered false or misleading due to this nondisclosure.  If, for example, the proxy statement asserted that Clovis was in full compliance with FDA rules and was reporting complete, accurate results to the FDA, then nondisclosures (i), (ii), and (iv) above would render the proxy false.  But the proxy statement did not say this, or anything near it.  It said only that the audit committee oversees compliance with regulatory and legal requirements.  ECF No. 35 at ¶81.  This statement is not false or misleading simply because the audit committee may have been doing its job poorly.  Plaintiff's attempt to link nondisclosures (ii) and (v) to the proxy language suffers from the same infirmity.  Clovis' officers and directors appear to have engaged in a lot of bad behavior that lost the company's stockholders a lot of money.  That bad behavior, however, does not render false or misleading the proxy statement's banal language on its approach to corporate governance or risk management or its adoption of an ethics code.

I conclude that plaintiff fails to allege any omission of material fact that makes Clovis' 2015 proxy statement false or misleading.  In reaching this conclusion I do not mean to undermine the severity of the fiduciary breach allegations in the complaint.  This strikes me as a case of serious corporate mismanagement.  However, the redress plaintiff seeks under 15 U.S.C. § 78n(a) and 17 C.F.R. § 240.14a-9 is not available to him on these facts.  Defendants' motion to dismiss the Section 14(a) claim under Fed. R. Civ. P. 12(b)(6) is therefore GRANTED.

3. Whether there was an essential link between the proxy statement and the proposed

corporate action

Plaintiff has failed to allege any false or misleading statement in Clovis' 2015 proxy

statement.  As a result, I need not reach the issue of whether plaintiff has sufficiently pled the

"essential link" element of a Section 14(a) claim.

**B. Plaintiff's breach of fiduciary duty claim**

Plaintiff also alleges that defendants breached their fiduciary duties of candor, good faith,

and loyalty.  ECF No. 35 at ¶112.  Defendants' motion to dismiss argues that I must dismiss this

claim under FED. R. CIV. P. 12(b)(3) based on an enforceable forum selection clause.  ECF No.

40 at 9–10; *see also* ECF No. 31 at 3.  They assert that Clovis' Certificate of Incorporation

contains a clause stating that Delaware's Court of Chancery shall be the "sole and exclusive

forum" for derivative actions and for claims for breach of fiduciary duties by officers and

directors.  *Id.*

Plaintiff does not contest the enforceability of this forum selection clause.  *See generally*

ECF Nos. 32, 41.  In fact, plaintiff does not even address the breach of fiduciary duty claim in

his response to defendants' motion.  ECF No. 41.  Plaintiff does, however, state that he "will

abide by the Company's exclusive forum provision" if this Court dismisses the Section 14(a)

claim.  ECF No. 32 at 3 n.3.

This order dismisses plaintiff's Section 14(a) claim.  Because there is no dispute between

plaintiff and defendants regarding the forum selection clause in Clovis' Certificate of

Incorporation, I find that it is valid and enforceable.  I also hold that it governs this claim.  I

therefore GRANT defendants' motion to dismiss plaintiff's cause of action for breach of fiduciary duty.  Plaintiff may refile that claim in the Delaware Court of Chancery.

## ORDER

Defendants' motion to dismiss [ECF No. 40] is GRANTED.  The Court enters its final written judgment dismissing this case.  Count I (violation of Section 14(a) of the Securities Act 14) is dismissed with prejudice.  Count II (breach of fiduciary duty) is dismissed without prejudice and with leave to refile in the Delaware Court of Chancery.  As the prevailing parties defendants are awarded their reasonable costs to be taxed by the Clerk pursuant to FED. R. CIV. P. 54(d)(1) and D.C.COLO.LCivR 54.1.

DATED this 29th day of September, 2020.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge